Filed 10/15/13

<u>CERTIFIED</u> <u>FOR</u> <u>PUBLICATION</u>

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(San Joaquin)

----

| | |
|---|---|
| BRIAN K. MCGUIRE et al., | C067865 |
| Plaintiffs and Appellants, | (Super. Ct. No. CV033853) |
| v. | |
| MORE-GAS INVESTMENTS, LLC, | |
| Defendant and Respondent. | |

APPEAL from a judgment of the Superior Court of San Joaquin County, Lesley D. Holland, Judge. Reversed with directions.

Neumiller & Beardslee, Clifford W. Stevens, Elizabeth J. Morrell, and Michael R. Tener for Plaintiffs and Appellants.

Downey Brand, Kevin M. Seibert, Matthew J. Weber, and Jenny Dione Dennis for Defendant and Respondent.

In this breach of contract case, plaintiffs Brian K. and Shirley A. McGuire and Lynn F. and Mary A. Smith (collectively, plaintiffs) sued defendant More-Gas Investments, Inc. (More-Gas) over two contracts in which plaintiffs agreed to purchase certain real estate from More-Gas. In each instance, More-Gas had refused to pay

1

plaintiffs money More-Gas had promised to pay in the alternative to performing certain other tasks relating to the properties.

More-Gas successfully moved for summary adjudication of the breach of contract causes of action on the ground the payment provisions were unenforceable penalty provisions rather than valid liquidated damages clauses. On plaintiffs' appeal, we conclude the trial court erred because More-Gas's motion for summary adjudication failed to eliminate the possibility that the contractual provisions in question were instead valid provisions for alternative performance. Accordingly, we reverse.

FACTUAL AND PROCEDURAL BACKGROUND

*The Orchard Property*

In May 2006, plaintiffs contracted to purchase for $1,050,000 two lots More-Gas owned on Orchard Road in Acampo. Three addendums to the purchase agreement required More-Gas to ensure that the owners of three neighboring lots (9, 11, and 13) would not be permitted to build any structure within 900 feet of the access road to be constructed along the north side of the lots. As relevant here, the third addendum (which superseded a paragraph in the first addendum) addressed this subject as follows:

"Seller hereby represents and warrants that Lots 9, 11, and 13 are not or shall not be permitted to construct or install any structure within nine hundred (900) feet of the access road to be constructed along the North side of the Lots. Seller will provide written documentation to Buyer's satisfaction prior to the close of escrow that: (i) the Lessor under the Lease referenced below shall not permit any owner of Lots 9, 11, and 13, to construct or install any structure within nine hundred (900) feet of the access road to be constructed along the North side of the Lots; and (ii) a sufficient number of future owners of the Lots within the subdivision have agreed to amend the CC&Rs, if necessary, to ensure that the Owners of Lots 9, 11, and 13 are not permitted to construct or install any structure within nine hundred (900) feet of the access road to be constructed along the North side of the Lots. If Seller does not provide both (i) and (ii) prior to the close of

2

escrow, Seller shall be required to take any steps necessary to amend the CC&Rs to require that the owners of Lots 9, 11, and 13 shall not be permitted to construct or install any structure within nine hundred (900) feet of the access road to be constructed along the North side of the Lots. If Seller is unable to amend the CC&Rs and cause the amendment to be recorded, as required herein, within two (2) months from the date of the close of escrow, Seller shall refund to [plaintiffs] Eighty Thousand Dollars ($80,000) from the purchase price under the Agreement. Buyer may accept, but is not required to accept, a satisfactory alternative method to amending the CC&Rs."

Lynn Smith testified at his deposition that the purpose of the desired building restriction was to preserve the "feel" that the houses plaintiffs planned to build on the two lots they were buying were "out in the middle of the vineyards" and without the building restriction plaintiffs believed they would be "substantially damaged." As for the $80,000 refund to be paid if the restriction was not obtained, Smith testified that he did not remember how that figure was determined. He admitted plaintiffs did not do any market research to determine what the diminution in the value of the property would be in the absence of the building restriction. Instead, Smith testified that, "in all honesty," he thought they "just talked about it between Tom Gassner[1] and ourselves and we all agreed on that eighty thousand dollars." Smith did not "think [they] were talking about damages." Gassner just said, " 'I'm going to get it done and eighty thousand dollars is fine.' "

Escrow closed on plaintiffs' purchase of the Orchard property on June 22, 2006. More-Gas failed to amend the CC&Rs to include the building restriction within two

---

[1]     Thomas Gassner is one of the members of More-Gas. In his declaration in support of the motion for summary adjudication, Gassner claimed he was "the individual at More-Gas [who] had most of the dealings directly with Plaintiffs." Gassner was named as a defendant in this action, but the claims against him are not before us on appeal.

months from the closing. In December 2007, plaintiffs demanded that More-Gas refund the $80,000, but More-Gas refused to do so.

*The Jahant Property*

In June 2006, plaintiffs contracted to purchase for $2 million some property More-Gas owned on East Jahant Road in Acampo. The purchase agreement identified the property as consisting of six parcels of approximately five acres each. At that time, however, the property actually consisted of a single parcel that had not yet been subdivided. A tentative subdivision map for the property had been approved, but no final map had yet been filed.

The purchase agreement provided an outside closing date of August 5, 2006. Around the first of August, when it became clear that the final subdivision map would not be filed by the closing date (because the public works department had not yet approved the improvement plans), the parties signed an addendum to the purchase agreement providing for More-Gas to continue its efforts to finalize the subdivision following the close of escrow.[2] As relevant here, the addendum provided as follows:

" 'Seller shall, at the sole expense of Seller, construct the extension of Tretheway Road (connecting Tretheway to Jahant Road) according to the specifications of San Joaquin County and as required by the conditions of approval issued with the tentative map for the Property ("Road Construction"). The Road Construction shall be completed on or before the date that is twelve (12) months after the Close of Escrow. Purchaser hereby grants Seller a license to enter onto the Property and perform such work. . . . If Seller fails to complete the Road Construction within twelve (12) months after the Close

---

[2] The parties elected not to extend the closing date on the purchase agreement in order to accommodate a 1031 exchange (an exchange of investment property to defer capital gains taxes).

4

of Escrow, Purchaser may complete the Road Construction at Seller's expense, as described in Section 4 as amended by the First Addendum.' "

The amendment to section 4 of the purchase agreement consisted of the following new language:

" 'In the event that Seller has not recorded a final map creating the six (6) parcels to be purchased by Purchaser hereunder on or before the Outside Date, the Close of Escrow shall nevertheless take place on or before the Outside Date, and the following shall apply. In the event that the Close of Escrow takes place and a final map has not yet been recorded, the total amount due from Purchaser at the Close of Escrow less any amount deposited by Purchaser and less Purchaser's exchange funds (which shall not be less than four hundred thousand dollars ($400,000.00)), shall be paid by Purchaser to Seller in the form of a promissory note accruing no interest (the "Note"). The Note shall be due and payable within fifteen (15) days of the recordation of a final map creating six (6) 5-acre parcels within the Property. The Note shall be secured by a deed of trust covering the Property, which deed of trust shall be subordinate to any deed of trust in favor of Purchaser's lender recorded in connection with a loan used for the acquisition of the Property or construction of improvements on the Property, if any. Seller shall cause the final map to be recorded as soon as practicable after the Close of Escrow, but in all cases on or before twelve (12) months from the Close of Escrow. If the final map is not recorded on or before twelve (12) months from the Close of Escrow, then [Purchaser] shall select one of the following options and notify Seller in writing within (15) days which option [Purchaser] has selected: (i) Purchaser may require Seller to purchase the Property from Purchaser for two million five hundred thousand dollars ($2,500,000.00); or (ii) Purchaser may retain the Property and Seller shall be relieved of the responsibility to cause the final map to be recorded, in which case Seller shall reasonably cooperate with Purchaser in Purchaser's efforts to cause the final map to be recorded. If Purchaser elects to retain the property as described above, the Note shall be due and payable on or

5

before thirteen (13) months from the Close of Escrow.  In all cases, if the Road Construction has not been completed prior to the time payment on the Note is due, Purchaser may deduct an amount equal to two hundred fifty thousand dollars ($250,000.00) plus the amount of Seller's bond required to ensure completion of the Road Construction, from the amount of payment due on the Note, which setoff amount shall be due and payable on the first of the following dates to occur:  (i) fifteen (15) days following Seller's notice to Purchaser upon completion of the Road Construction by Seller; or (ii) within six (6) months from date of Purchaser's election to retain the property as described above, less any amount of reasonable actual costs incurred by Purchaser in completing the Road Construction.  Purchaser and Seller agree to cooperate and take reasonable action in order to accomplish the recordation of the final map in accordance with this Section.' "

Brian McGuire testified at his deposition that plaintiffs purchased the Jahant property based on the assumption they were going to be buying "finished buildable lots," and he never gave any consideration to what the property would be worth if the final map was not approved.  He did not recall how they came up with $500,000 as the additional amount More-Gas would have to pay plaintiffs to buy the property back if plaintiffs elected that option in the event the final map was not recorded within the time allowed.  As for Smith, when he was asked where the $500,000 "repurchase premium" came from, he said he did not "know how [they] determined or came to that exact amount."  He testified that they "put in an amount that [they] felt would be an incentive to get the job done on time which would allow [them] to build the houses."  Because "prices were going up" and "property was appreciating at that time" and they would have "a year into the project," they "felt . . . five hundred thousand dollars would be a -- a fair amount regardless of what happened."  They did not "do a formal market analysis" but they "figured that five-hundred-thousand-dollar appreciation in a year at that time, twenty-five percent was not unheard of."

6

Following the closing of the deal in August 2006, plaintiffs gave More-Gas a promissory note for $1,594,307.11 for the Jahant property pursuant to the terms of the addendum to the purchase agreement. The following April, plaintiffs failed to pay the property tax installment due for the Jahant property. More-Gas elected to treat that failure as a default under the deed of trust securing the promissory note, and in July 2007 More-Gas recorded and served a notice of default and election to sell the property under the deed of trust.

Twelve months passed from the close of escrow and More-Gas failed to record the final map on the Jahant property within that period. Accordingly, on August 9, 2007, plaintiffs notified More-Gas that they were electing to require More-Gas to repurchase the property for $2.5 million. More-Gas refused to do so.

*The Present Action*

In October 2007, plaintiffs commenced this action against More-Gas. The following month, the court issued a preliminary injunction preventing More-Gas from proceeding with a nonjudicial foreclosure sale of the Jahant property. In March 2008, plaintiffs and More-Gas entered into a partial settlement agreement. The terms of that settlement provided that plaintiffs would convey the Jahant property to More-Gas, and in exchange the promissory note on the property would be deemed paid in full and the deed of trust would be reconveyed. In addition, the agreement provided that More-Gas would deposit a portion of the proceeds from any subsequent sale of the Jahant property, either in part or in full, in an account to be held pending the resolution of this action, up to a total of $1,075,000. Those funds were to be available to satisfy any judgment for damages plaintiffs might receive in this action. The agreement also provided that More-Gas was to provide plaintiffs with a deed of trust on the Jahant property securing the performance of More-Gas's obligations under the partial settlement agreement.

The partial settlement agreement provided that "[w]ithin ten (10) days of any final judgment in this matter," "[i]f Plaintiffs are not awarded damages as part of a final

7

judgment, then Plaintiffs shall reconvey the [More-Gas] Deed of Trust." The agreement also specified that it was "expressly intended to be an accommodation to the Parties so that the Property c[ould] be effectively and efficiently entitled, developed, improved, and sold to the benefit of all Parties," and that while the agreement "temporarily alter[ed the Parties'] rights, the Parties also expect[ed] that all other rights and remedies may continue to be pursued and w[ould] not be altered by this Agreement."

In April 2010, plaintiffs filed a third amended complaint in this action, setting forth 12 causes of action. As relevant here, plaintiffs alleged in their second cause of action that More-Gas failed to fulfill its obligations under the purchase agreement for the Orchard property by failing to secure the promised amendment to the CC&Rs and breached the contract by failing to refund the $80,000 to plaintiffs. As damages, plaintiffs sought recovery of the $80,000. In their sixth cause of action, plaintiffs alleged that More-Gas breached the purchase agreement for the Jahant property by failing to record the final map by the deadline and by refusing to repurchase the property. As damages, plaintiffs sought $905,692.89, which represented the $2.5 million repurchase price minus the amount of the promissory note that was deemed paid in full under the partial settlement agreement.[3]

In August 2010, More-Gas moved for summary adjudication of the first 11 causes of action in the third amended complaint. With respect to plaintiffs' causes of action for breach of contract on the Orchard and Jahant properties, More-Gas sought summary adjudication on the grounds that plaintiffs could not prove they suffered any actual damages and the damages they sought in their complaint were unrecoverable because the provisions providing for payment of those amounts were unenforceable penalty provisions rather than valid liquidated damages clauses.

---

[3]     Viewed another way, this damages figure also represented the amount of plaintiffs' down payment on the Jahant property plus the $500,000 repurchase premium.

8

In opposing the motion for summary adjudication, plaintiffs addressed only More-Gas's arguments relating to the two breach of contract causes of action (thus effectively conceding the motion with respect to the other nine causes of action).  Plaintiffs argued that the payment provisions in question were not unenforceable penalty provisions or even liquidated damages clauses but instead were "bargained-for options for alternative performance."  Thus, plaintiffs contended that under the purchase agreement for the Orchard property, More-Gas "could opt not to make [the] amendments [to the CC&Rs] and [instead] refund to Plaintiffs $80,000 from the Orchard Property purchase price."  Similarly, plaintiffs contended that under the purchase agreement for the Jahant property, More-Gas could "opt not to [record the final map] which in turn provided Plaintiffs with the option, which they exercised, to require [More-Gas] to repurchase the Jahant Property for a sum of $2,500,000."

After granting summary adjudication on the nine causes of action plaintiffs did not address in their opposition to the motion, the trial court addressed whether "the refund provision of the Orchard Property agreement, and/or the re-purchase provision of the Jahant Property agreement [were] enforceable."  With respect to the $80,000 refund, the court concluded there was "no indication in the record that $80,000 was any sort of estimate of fair damages; rather, the evidence reveals that $80,000 was an arbitrary sum chosen to 'incentivize' the amending of the [CC&Rs].  . . .  [T]he provision appears clearly to be a monetary 'club' -- or penalty, to use the technical legal term -- and, as such, is unenforceable."  With respect to the $2.5 million repurchase price, the court concluded it, too, was "an unenforceable penalty" because "the figure was selected not by any sort of analysis, calculation, formula, or reckoning" and because "Smith . . . testified that it would have been easy to calculate the damages upon a breach of the Jahant Property agreement simply by having the repurchase price be the 'market' price . . . [b]ut, according to Mr. Smith, Plaintiffs did not intend the $500,000 premium in the First Addendum to be an estimate of Plaintiffs' anticipated damages upon a breach of the

9

Jahant agreement," but instead "intended the $500,000 premium to be an incentive [for More-Gas] to record the final map." (Bold text and italics omitted.) Based on these conclusions, the trial court granted summary adjudication on the second and sixth causes of action.

Following the granting of More-Gas's summary adjudication motion, plaintiffs apparently dismissed the sole remaining cause of action in their third amended complaint, paving the way for the entry of judgment in favor of More-Gas, which occurred in January 2011. In February 2011, More-Gas moved for an order requiring plaintiffs to reconvey the deed of trust on the Jahant property pursuant to the partial settlement agreement. Plaintiffs opposed the motion on the ground that More-Gas had not demonstrated that the trial court had jurisdiction to make such a postjudgment order and the ground that the judgment was not "final" within the meaning of the partial settlement agreement because it was still subject to appeal.

The trial court granted More-Gas's motion and ordered plaintiffs to reconvey the deed of trust. Thereafter, plaintiffs timely appealed from the judgment and from the postjudgment order.

DISCUSSION

I

*Summary Adjudication*

"A party may move for summary adjudication as to one or more causes of action within an action . . . if that party contends that the cause of action has no merit . . . . A motion for summary adjudication shall be granted only if it completely disposes of a cause of action . . . ." (Code Civ. Proc., § 437c, subd. (f)(1).)

"The rules applicable to summary judgments apply equally to motions for summary adjudication. [Citation.] Summary judgment is granted when a moving party establishes the right to the entry of judgment as a matter of law. [Citation.] In reviewing an order granting summary judgment, we must assume the role of the trial court and

10

redetermine the merits of the motion. In doing so, we must strictly scrutinize the moving party's papers. The declarations of the party opposing summary judgment, however, are liberally construed to determine the existence of triable issues of fact. All doubts as to whether any material, triable issues of fact exist are to be resolved in favor of the party opposing summary judgment. While the appellate court must review a summary judgment motion by the same standards as the trial court, it must independently determine as a matter of law the construction and effect of the facts presented. [Citation.] Accordingly, we are not bound by the trial court's stated reasons and review only the ruling, not its rationale." (*Blue Shield of California Life & Health Ins. Co. v. Superior Court* (2011) 192 Cal.App.4th 727, 732 (*Blue Shield).*)

"A defendant moving for summary judgment meets its burden of showing that there is no merit to a cause of action if that party has shown that one or more elements of the cause of action cannot be established or that there is a complete defense to that cause of action. [Citation.] If the defendant does so, the burden shifts back to the plaintiff to show that a triable issue of fact exists as to that cause of action or defense." (*Blue Shield*, *supra*, 192 Cal.App.4th at p. 732.)

Here, plaintiffs do not argue that a triable issue of fact exists. Rather, their primary contention essentially is that More-Gas never met its initial burden on the motion for summary adjudication because, based on the undisputed facts, the refund provision in the purchase agreement for the Orchard property and the repurchase premium in the purchase agreement for the Jahant property were not unenforceable penalty provisions but instead were enforceable provisions for alternative performance. To analyze this contention, we must first explore the law of liquidated damages.

II

*The Law Of Liquidated Damages*

"The term 'liquidated damages' is used to indicate an amount of compensation to be paid in the event of a breach of contract, the sum of which is fixed and certain by

11

agreement, and which may not ordinarily be modified or altered when damages actually result from nonperformance of the contract." (*Kelly v. McDonald* (1929) 98 Cal.App. 121, 125, disapproved on other grounds by *McCarthy v. Tally* (1956) 46 Cal.2d 577, 587.) "Liquidated damages constitute a sum which a contracting party agrees to pay or a deposit which he agrees to forfeit for breach of some contractual obligation." (*ABI, Inc. v. City of Los Angeles* (1984) 153 Cal.App.3d 669, 685, italics omitted.) A liquidated damages provision in a contract "normally stipulates a pre-estimate of damages in order that the parties may know with reasonable certainty the extent of liability for a breach of their contract." (*Ibid.*)

"Under the 1872 Civil Code, a provision by which damages for a breach of contract were determined in anticipation of breach was enforceable only if determining actual damages was impracticable or extremely difficult." (*Ridgley v. Topa Thrift & Loan Assn.* (1998) 17 Cal.4th 970, 977, citing 1872 Civ. Code, §§ 1670, 1671.) "Departing radically from the former law, on July 1, 1978, the Legislature repealed Civil Code section 1670, and amended section 1671 in order to express a new policy favoring the enforcement of liquidated damage provisions except against the consumer in a consumer case. (Civ. Code, § 1671, subds. (b) and (c); see Cal. Law Revision Com. comment on § 1671, subd. (b).) In pertinent part, subdivision (b) of Civil Code section 1671 now provides that ' . . . a provision in a contract liquidating the damages for the breach of a contract is valid unless the parties seeking to invalidate the provision establishes that the provision was unreasonable under the circumstances existing at the time the contract was made.' " (*ABI, Inc. v. City of Los Angeles*, *supra*, 153 Cal.App.3d at pp. 684-685, italics omitted.)

"A liquidated damages clause will generally be considered unreasonable, and hence unenforceable under section 1671(b), if it bears no reasonable relationship to the range of actual damages that the parties could have anticipated would flow from a breach. The amount set as liquidated damages 'must represent the result of a reasonable endeavor

by the parties to estimate a fair average compensation for any loss that may be sustained.' [Citation.] In the absence of such relationship, a contractual clause purporting to predetermine damages 'must be construed as a penalty.' [Citation.] 'A penalty provision operates to compel performance of an act [citation] and usually becomes effective only in the event of default [citation] upon which a forfeiture is compelled without regard to the damages sustained by the party aggrieved by the breach [citation]. The characteristic feature of a penalty is its lack of proportional relation to the damages which may actually flow from failure to perform under a contract. [Citations.]' [Citation.]

"In short, '[a]n amount disproportionate to the anticipated damages is termed a "penalty." A contractual provision imposing a "penalty" is ineffective, and the wronged party can collect only the actual damages sustained.' " (*Ridgley v. Topa Thrift & Loan Assn., supra*, 17 Cal.4th at pp. 977-978.)

It is important to recognize, however, that a provision in a contract that appears at first glance to be either a liquidated damages clause or an unenforceable penalty provision may instead merely be a provision that permissibly calls for alternative performance by the obligor. "A contractual provision that merely provides an option of alternative performance of an obligation does not impose damages and is not subject to section 1671 limitations." (*Cellphone Termination Fee Cases* (2011) 193 Cal.App.4th 298, 328.) Thus, notwithstanding the limitations on liquidated damages clauses provided in Civil Code section 1671, the courts "recognize . . . the validity of provisions varying the acceptable performance under a contract upon the happening of a contingency." (*Garrett v. Coast & Southern Fed. Sav. & Loan Assn.* (1973) 9 Cal.3d 731, 738 (*Garrett*).)

In some cases, though, "a form of alternative performance is used to mask what is in reality a penalty or forfeiture." (*Blank v. Borden* (1974) 11 Cal.3d 963, 970.) "The mere fact that an agreement may be construed, if in fact it can be, to vest in one party an option to perform in a manner which, if it were not so construed, would result in a

13

penalty does not validate the agreement." (*Garrett*, *supra*, 9 Cal.3d at p. 737.) "[W]hen it is manifest that a contract expressed to be performed in the alternative is in fact a contract contemplating but a single, definite performance with an additional charge contingent on the breach of that performance, the provision cannot escape examination in light of pertinent rules relative to the liquidation of damages." (*Id.* at p. 738.)

"In evaluating the legality of a provision, a court must first determine its true function and operation." (*Cellphone Termination Fee Cases*, *supra*, 193 Cal.App.4th at p. 328.) Our Supreme Court has "consistently ignored form and sought out the substance of arrangements which purport to legitimate penalties and forfeitures." (*Garrett*, *supra*, 9 Cal.3d at p. 737.) Where "the contract clearly reserves to the owner the power to make a realistic and rational choice in the future with respect to the subject matter of the contract," a valid alternative performance provision will be found. (*Blank v. Borden*, *supra*, 11 Cal.3d at p. 971.) On the other hand, where the "arrangement, viewed from the time of making the contract, realistically contemplates no element of free rational choice on the part of the obligor insofar as his performance is concerned," the provision will be deemed to provide for a penalty. (*Ibid.*)

"Whether the amount to be paid upon breach of a contractual term should be treated as liquidated damages or as an unenforceable penalty is a question of law, which we review de novo." (*Greentree Financial Group, Inc. v. Execute Sports, Inc.* (2008) 163 Cal.App.4th 495, 499.) More broadly, unless it turns on the credibility of extrinsic evidence, the interpretation of a written contract is solely a judicial function, and an appellate court is not bound by the trial court's construction of the contract. (*Parsons v. Bristol Development Co.* (1965) 62 Cal.2d 861, 865.) Thus, we review de novo the question of whether the contracts at issue here involved enforceable provisions for alternative performance or unenforceable penalty provisions.

With these legal principles in mind, we turn to the arguments in this case.

## III

### *The Orchard Property Refund Provision*

Plaintiffs contend the trial court erred in finding the refund provision in the purchase agreement for the Orchard property was unenforceable because, in plaintiffs' view, that provision is not a penalty provision or even a liquidated damages provision. Rather, they contend, "the refund provision in the Orchard agreement simply reflects the fact that [plaintiffs] accepted the Orchard property in incomplete condition" and the $80,000 refund was "a wholly-proper reduction in the purchase price on account of More-Gas'[s] failure to complete the amendment to the CC&Rs." Stated another way, plaintiffs contend "the Orchard refund provision does not fix damages for a breach of the agreement. Rather, the provision specifies alternative performance: More-Gas could complete the recording of the CC&Rs within two months or could refund $80,000 to [plaintiffs]. More-Gas could have performed under the agreement by doing either of those two things."

In support of this argument, plaintiffs cite *Stevens v. Los Angeles Dock etc. Co.* (1912) 20 Cal.App. 743 (*Stevens*), contending "there is no meaningful distinction between the Orchard Property situation and the *Stevens* case." In *Stevens*, defendant Los Angeles Dock & Terminal Company (the company) contracted to sell a subdivision in Long Beach to plaintiff Stevens and another party. (*Stevens*, *supra*, 20 Cal.App. at p. 744.) The sales price "was $31,850, $12,740 being paid at the date of the signing of the agreement, $9,555 being payable on or before the fifteenth day of July, 1906, and the balance of $9,555 on or before the fifteenth day of January, 1907." (*Ibid.*) The deed to the property was to be conveyed when all of the payments were made. (*Ibid.*) The contract further provided that the company was to "fill [the] land and raise it to a uniform height of at least three feet above its present elevation, or such other height as [the buyers] might desire, not exceeding ten feet," "grade all streets in [the] tract," and "put in

15

cement curbs and sidewalks," and if the improvements were not completed within 18 months, "the third payment should not be required." (*Id.* at p. 745.)

Stevens subsequently sued the company for specific performance, alleging all of the payments had been made except the third one because the company did not make the specified improvements within 18 months. (*Stevens*, *supra*, 20 Cal.App. at p. 745.) After the matter was tried to the court, the trial court granted judgment in Stevens's favor, finding that "the agreement to waive the third payment for [the] land in case [the] improvements should not be completed within eighteen months was fair and reasonable" and "the first and second payments expressed in [the] agreement for [the] lands constituted the reasonable and adequate value thereof in an incomplete and unfilled condition and [were] not disproportionate to the value of [the] lands." (*Id.* at pp. 746-747.)

On appeal, the company argued that "th[e] waiver of the third payment in default of the making of the improvements was a contract either for a penalty or for liquidated damages; that, regarding the same as one for liquidated damages, under [former] section 1670 of the Civil Code, the same is void because from the nature of the case it was neither impracticable nor extremely difficult to fix the actual damages in the event of failure to perform the conditions, and that there is no evidence in the record tending to show the amount of actual damages, if any existed; and further, that if treated as a penalty, under section 3369 of the Civil Code, specific relief cannot be granted to enforce a penalty or forfeiture in any event." (*Stevens*, *supra*, 20 Cal.App. at p. 748.) The appellate court rejected the company's argument, concluding as follows:

"The learned trial judge in construing the agreement determined the case evidently upon the theory that the so-called waiver of the third payment was neither an attempt to liquidate damages, nor in the nature of a penalty, but was, in effect, an agreement to sell property in an incomplete condition for a fixed price, which was the cash price plus the first deferred payment, with an option to make certain improvements thereon within

16

eighteen months, which, if made, then the price agreed upon should be the total amount specified, which included the third payment. In other words, that the specified third payment was nothing more than a stipulation as to the enhancement in value which would attach to the property in the event that the contemplated improvements were made within the specified time, and if so made that the plaintiff should pay therefor a stipulated sum; a condition somewhat analogous to a contract involving a sale of vacant property at a fixed price, with an option to construct a house thereon of certain character within a stipulated time, which, if done by the seller, an additional price should be paid therefor. We are of opinion that this is a fair construction of this contract, and so construed it is not open to the criticism offered, and does not come within the provisions of the sections of the Civil Code above cited, and that the allegations of the complaint were sufficient to warrant the relief granted." (*Stevens*, *supra*, 20 Cal.App. at p. 748.)

Analogizing this case to *Stevens*, plaintiffs argue that just as the buyers in *Stevens* were "entitled to deduct almost a third of the purchase price because contracted-for improvements were not timely completed," here plaintiffs "are entitled to a refund amounting to less than eight percent of the purchase price . . . because the CC&R amendment necessary to accomplish the purpose for which [they] purchased the property was not timely recorded."

In response to this argument, More-Gas first notes that *Stevens* is "a 100 year old case that has never been cited by another California case." That fact is of no significance. While it is true *Stevens* has never been cited by any published appellate decision in California, that does not undercut the validity of the reasoning in the case. Indeed, the principle applied in *Stevens* is well known in the common law, including here in California. An appellate court in New York that cited *Stevens* over 70 years ago succinctly articulated that principle as follows: "Where the agreement of the promisor is to do a certain thing or in default thereof to pay a certain sum of money, our courts, on his failure to do the particular thing, consider him as having had his election, and hold

17

him liable to pay the agreed sum of money. This form of contract, while approaching very near to a stipulation for a penalty for non-performance, is distinguishable therefrom and enforced according to its terms, and is considered as giving the promisor the election to refuse to do the act and in lieu thereof to pay the amount agreed." (*Hasbrouck v. Van Winkle* (1941) 27 N.Y.S.2d 72, 76.)

Thus, *Stevens* is an example of that class of cases where the contract gives the promisor the option of alternative performance, and in such a case no question of breach or of liquidated damages arises. Another example of that type of case from California is *Blank v. Borden*, *supra*, 11 Cal.3d at page 963. There, a homeowner entered into an exclusive-right-to-sell contract with a real estate broker. (*Id.* at p. 966.) The contract gave the broker the exclusive right to sell the homeowner's property for a seven-month period in exchange for 6 percent of the selling price and provided that if the homeowner withdrew the property from sale during that period the broker would receive 6 percent of the initial listing price. (*Id.* at p. 966 & fn. 1.)

Before the Supreme Court, the homeowner argued that the withdrawal-from-sale provision "should be denied enforcement as an unlawful penalty," but the Supreme Court rejected that argument on the ground that the terms of the contract before it "in no sense contemplated a 'default' or 'breach' of any obligation by the owner upon whose occurrence payment is to be made. On the contrary, the clause in question presents the owner with a true option or alternative: if, during the term of an exclusive-right-to-sell contract, the owner changes his mind and decides that he does not wish to sell the subject property after all, he retains the power to terminate the agent's otherwise exclusive right through the payment of a sum certain set forth in the contract. [¶] We do not see in this arrangement the invidious qualities characteristic of a penalty or forfeiture. . . . [W]hat distinguishes the instant case from other situations in which a form of alternative performance is used to mask what is in reality a penalty or forfeiture is the element of rational choice. . . . [¶] In the instant case, . . . the contract clearly reserves to the owner

18

the power to make a realistic and rational choice in the future with respect to the subject matter of the contract. . . . In these circumstances, the contract is truly one which contemplates alternative performance, not one in which the formal alternative conceals a penalty for failure to perform the main promise." (*Blank v. Borden*, *supra*, 11 Cal.3d at pp. 969, 970-971, fns. omitted.)

Like the contract in *Blank*, the contract is *Stevens* contemplated alternative performance, giving the company the rational choice of which performance to tender: either the company could make the specified improvements to the property and collect the third installment payment or the company could decline to make those improvements and forego the third payment. The purchase agreement for the Orchard property provided More-Gas with a similar choice. More-Gas could either secure the specified amendment to the CC&Rs and keep the $80,000 or decline to secure that amendment and refund the $80,000 to plaintiffs. Viewed in this manner, the purchase agreement for the Orchard property can be understood to contain an enforceable provision for alternative performance rather than an unenforceable penalty provision.[4]

Attempting to distinguish *Stevens*, More-Gas first contends "it cannot be argued the [Orchard] property was in an incomplete condition as [plaintiffs] sold it and set a price without even considering the lack of the CC&Rs." This argument is based on McGuire's deposition testimony regarding plaintiffs' later sale of one of the two Orchard lots. McGuire's testimony was that he did not have a "specific memory" of whether anyone told him the condition of the CC&Rs negatively affected the value of the property and he did not think the condition of the CC&Rs affected "the price [they] listed the

---

[4]      As we explain hereafter, we are not concluding that the purchase agreement for the Orchard property *did* contain an enforceable provision for alternative performance rather than an unenforceable penalty provision; we are merely concluding that More-Gas failed to eliminate the possibility of the former and thereby failed to meet its initial burden on summary adjudication.

19

property for." This testimony has no bearing on whether the purchase agreement for the Orchard property falls within the category of cases exemplified by *Stevens* and *Blank*. It does not matter, for our purposes, what plaintiffs may have later believed about the effect of the absence of the building restriction in the CC&Rs on the value of one of the lots in the Orchard property on resale. In determining whether a contractual payment provision is a penalty provision or a provision for alternative performance, we must view the arrangement "from the time of making the contract." (*Blank v. Borden*, *supra*, 11 Cal.3d at p. 971.) Thus, what matters is what the parties knew or believed, and more importantly what they agreed to, at the time they entered into the purchase agreement for the Orchard property.

What the parties agreed to was that More-Gas would secure an amendment of the CC&Rs within two months or refund $80,000 of the sales price. More-Gas does not argue now, nor did it show by undisputed evidence in the trial court, that, viewed from the time of the making of the contract, it lacked "a realistic and rational choice" (*Blank v. Borden*, *supra*, 11 Cal.3d at p. 971) between securing the CC&R amendment and keeping the $80,000 on the one hand or foregoing the amendment and refunding the $80,000 to plaintiffs on the other hand. In fact, because More-Gas's summary adjudication motion was focused on showing that the refund provision was a penalty provision because it was not a valid liquidated damages clause, the motion did not address at all the factual issues involved in determining whether the choice between securing the desired amendment to the CC&Rs or giving back $80,000 was a realistic and rational choice when viewed from the time of making the contract. Thus, More-Gas failed to make the showing necessary to distinguish this case from *Stevens*, *Blank*, and the like.

More-Gas also attempts to distinguish this case from *Stevens* because here More-Gas "was not [to be] paid additional funds when the CC&Rs were recorded, it was required to pay [plaintiffs] if the CC&Rs were not recorded." While that is certainly a factual distinction between the two cases, it is not a *material* factual distinction. Whether

20

the money was to be held back and never paid (as in *Stevens*) or paid and then refunded (as here), the substance of the deal is the same in both instances. Here, the substance of the deal was that More-Gas would secure the amendment to the CC&Rs or would receive, in the end, $80,000 less for the Orchard property. That More-Gas initially received the $80,000 but then had to pay it back does not distinguish this case from *Stevens* in any significant manner.

Because More-Gas, as the party that moved for summary adjudication, failed to show that the refund provision in the purchase agreement for the Orchard property was an unenforceable penalty provision and *not* a valid provision for alternative performance, we conclude the trial court erred in its interpretation of the agreement. By this conclusion, we are not saying that the refund provision, as a matter of law, presented More-Gas with a realistic and rational choice when viewed from the time of the making of the contract. For our purposes, it is sufficient to conclude that on the evidence More-Gas presented in support of its motion for summary adjudication, More-Gas failed either to negate the possibility that the refund provision was a legally enforceable provision for alternative performance or to show that plaintiffs could not prove it was such a provision.[5] Accordingly, the trial court erred in granting summary adjudication to More-Gas on the second cause of action.

---

[5] In this regard, the present case is distinguishable from *Stevens*, because *Stevens* was decided following a court trial, not on summary judgment or summary adjudication, and thus the trial court there was able to determine based on the evidence produced at trial that "the first and second payments expressed in [the] agreement for [the] lands constituted the reasonable and adequate value thereof in an incomplete and unfilled condition" and therefore "the agreement to waive the third payment for said land in case said improvements should not be completed [] was fair and reasonable." (*Stevens*, *supra*, 20 Cal.App. at p. 747.)

21

IV

*The Jahant Property Repurchase Provision*

To a large extent, plaintiffs' primary argument regarding the provision in the purchase agreement for the Jahant property that allowed them to require More-Gas to repurchase the property for $500,000 more than plaintiffs had paid for it is substantially the same as their argument regarding the refund provision in the purchase agreement for the Orchard property. Specifically, plaintiffs contend "[t]he repurchase provision in the Jahant addendum was neither a 'damages' provision nor a provision fixing damages 'for breach' of the contract." Rather, in reliance on *Stevens*, plaintiffs contend they took the Jahant property "in its incomplete condition" -- that is, without the final subdivision map recorded -- "subject to an agreement with More-Gas that [More-Gas] would buy [the property] back at [plaintiffs'] election if More-Gas failed to make [the property] complete within one year." Plaintiffs flesh this argument out further in their reply brief, where they argue that "[u]nder the addendum to the original agreement, More-Gas had a choice to make: record the final map within one year, putting the property in the condition [More-Gas] had originally agreed to sell it to [plaintiffs], or honor the option if the [plaintiffs] chose to exercise it. Under circumstances More-Gas could reasonably have anticipated at the time of contracting, either choice might have been rational." Thus, plaintiffs contend the purchase agreement for the Jahant property did not contain a liquidated damages clause or penalty provision but instead contained a provision for alternative performance by More-Gas -- just like the purchase agreement for the Orchard property.

More-Gas contends plaintiffs' interpretation of the purchase agreement for the Jahant property is not tenable because plaintiffs "expressly alleged causes of action for promissory fraud against [More-Gas] on the basis that [plaintiffs] were induced to enter into the Jahant Agreement on the promise that the final map would be recorded even though [More-Gas] had no intention of performing those acts." According to More-Gas, if plaintiffs "truly believed that the Jahant Addendum provided [More-Gas] with the

22

option of recording the final map and failure to do so was not a breach, how could [plaintiffs] have been defrauded by [More-Gas] resulting from its failure to record the final map? How could [plaintiffs] claim they relied upon a promise they now claim was nothing more th[a]n an option for [More-Gas]?"

In determining the "true function and operation" (*Cellphone Termination Fee Cases*, *supra*, 193 Cal.App.4th at p. 328) of the repurchase premium in the purchase agreement for the Jahant property, which is what we are called on to do here, we are not bound by what plaintiffs may have pled in other causes of action, because they were entitled to plead inconsistent theories of recovery. (See *Roberts v. Ball, Hunt, Hart, Brown & Baerwitz* (1976) 57 Cal.App.3d 104, 110.) Thus, even if plaintiffs' fraud causes of action were inconsistent with the theory they now advance that the purchase agreement for the Jahant property contained a provision for alternative performance by More-Gas, it makes no difference.

More-Gas argues that the purchase agreement for the Jahant property did not contain a provision for alternative performance, like the contract in *Stevens*, because "if the improvements on the Jahant Property [we]re not completed by the dates specified, [More-Gas did] not lose a payment from [plaintiffs] but instead [wa]s required to give [plaintiffs] all of their money back, *plus $500,000.*" It is true this case is factually distinguishable from *Stevens* on that basis, but the more pertinent question is whether that factual distinction is *material*. Under *Blank v. Borden*, as discussed above, the pertinent question is whether the terms of the Jahant addendum, viewed from the time of making the contract, presented More-Gas with a true option or alternative -- a realistic and rational choice in the future with respect to the subject matter of the contract. It is not necessarily significant whether the consequences of the choice were identical or even similar to the consequences of the choice in *Stevens* -- the loss of an installment payment. What matters is whether the contract was "truly one which contemplate[d] alternative

23

performance" as opposed to "one in which the formal alternative conceal[ed] a penalty for failure to perform the main promise." (*Blank v. Borden*, *supra*, 11 Cal.3d at p. 971.)

In a footnote in *Blank*, the Supreme Court offered the following example from McCormick's treatise on damages to illustrate the difference between a valid contract providing for alternative performance and an invalid penalty provision:  " 'If a contract provides that A will either convey land then worth about $10,000 within six months at a price of $10,000 or will pay $250, it is quite clear that a reasonable man might look forward to either choice as a reasonable possibility, and there is no reason for hesitating to enforce the promise to pay if the land is not conveyed.  If, on the other hand, A's promise provides that he shall either pay $100 on January 1st or $200 on demand thereafter, a different situation is presented.  No reasonable man would, when the contract was made, consider that there was any rational choice involved (conceding the ability to pay either sum) in determining which course to pursue. If he can do so, he will pay the lesser sum, and the agreement necessarily is founded on this assumption, and the only purpose and effect of the formal alternative is to hold over him the larger liability as a threat to induce prompt payment of the lesser sum.  Consequently, while an alternative promise to pay money when it presents a conceivable choice is valid, yet, if a contract is made by which a party engages himself either to do a certain act or to pay some amount which at the time of the contract no one would have considered an eligible alternative, the alternative promise to pay is unenforceable as a penalty.' " (*Blank v. Borden*, *supra*, 11 Cal.3d at p. 971, fn. 7, quoting McCormick, Damages (1935) § 154, pp. 617-618, fns. omitted.)

The court in *Blank* also pointed to *Garrett* as presenting an example of an unenforceable penalty provision as opposed to a valid provision for alternative performance:  "There the contract, a promissory note secured by a deed of trust on real property, provided for the assessment of certain 'late charges' for failure to make timely installment payments on the note—such charges to be a percentage of the unpaid

24

principal balance for the period during which payment was in default. We held that these charges, which did not qualify as proper liquidated damages pursuant to Civil Code section 1671, constituted illegal penalties. In characterizing the subject provision we observed that its 'only reasonable interpretation . . . is that the parties agreed upon the rate which should govern the contract and then, realizing that the borrowers might fail to make timely payment, they further agreed that such borrowers were to pay an additional sum as damages for their breach[,] which sum was determined by applying the increased rate to the entire unpaid principal balance.' [Citation.] Clearly this arrangement, viewed from the time of making the contract, realistically contemplates no element of free rational choice on the part of the obligor insofar as his performance is concerned; rather the agreement is founded upon the assumption that the obligor will make the lower payment. In these circumstances, as an eminent commentator has observed, 'the only purpose and effect of the formal alternative is to hold over [the obligor] the larger liability as a threat to induce prompt payment of the lesser sum.' " (*Blank v. Borden*, *supra*, 11 Cal.3d at pp. 970-971.)

With these examples in mind, the question for us to decide is whether, in its motion for summary adjudication, More-Gas showed, as a matter of law, that the repurchase premium in the purchase agreement for the Jahant property was an unenforceable penalty provision instead of being part of an enforceable provision for alternative performance. We conclude they did not do so. In reaching this conclusion, just as with the refund provision in the purchase agreement for the Orchard property, we are not saying the repurchase premium in the purchase agreement for the Jahant property, as a matter of law, presented More-Gas with a realistic and rational choice when viewed from the time of the making of the contract. We are simply saying that on the evidence More-Gas presented in support of its motion for summary adjudication, More-Gas failed to show that the repurchase premium was an unenforceable penalty provision instead of part of a legally enforceable provision for alternative performance.

25

The basis for this conclusion is that in moving for summary adjudication, More-Gas did not address at all the factual issues involved in determining whether the choice between recording the final subdivision map or giving plaintiffs the option to require More-Gas to buy the property back for $2.5 million was a realistic and rational choice when viewed from the time of making the contract. For example, there is no evidence of what the parties could have reasonably expected, at the time they entered into the Jahant addendum, that it would cost for More-Gas to finish the subdivision and get the final map recorded. Absent such evidence -- and whatever other evidence might be material to the point -- we have no basis for judging whether the choice between finishing the subdivision or giving plaintiffs the option of forcing More-Gas to repurchase the property at a $500,000 repurchase premium could have been viewed as a realistic and rational choice for More-Gas in August 2006.

Essentially what happened here is that More-Gas believed it could get out of the sixth cause of action on summary adjudication by showing that the repurchase premium in the purchase agreement for the Jahant property was not a valid liquidated damages clause but instead was an invalid penalty provision. More-Gas failed to appreciate that there was a third possibility -- that the repurchase premium was part of a valid provision for alternative performance. Because More-Gas failed to appreciate that third possibility, More-Gas's motion did not address the facts necessary to negate that possibility, or at least to show that plaintiffs could not prove that possibility.

For the foregoing reasons, we conclude -- as we did with the purchase agreement for the Orchard property -- that the trial court erred in interpreting the purchase agreement for the Jahant property. Because More-Gas failed to establish that the repurchase premium was necessarily a penalty provision, as opposed to a provision for alternative performance, the trial court erred in granting summary adjudication on the sixth cause of action as well.

26

V

*Reconveyance Of The Deed Of Trust On The Jahant Property*

Plaintiffs contend that because the trial court's postjudgment order requiring them to reconvey the deed of trust on the Jahant property was based on the trial court's judgment in favor of More-Gas, which awarded no damages to plaintiffs, "in the event that th[e] judgment is reversed, the grounds for the order disappear," and the postjudgment order should be reversed as well. We agree. The postjudgment order was premised on the provision in the partial settlement agreement requiring plaintiffs to reconvey the deed of trust within 10 days of any final judgment in the matter. Our disposition of this appeal necessarily means there is no final judgment in this case yet. Accordingly, no reconveyance can be required at this time.

DISPOSITION

The judgment and the postjudgment order are reversed, and the case is remanded to the trial court with instructions to vacate its order granting More-Gas's motion for summary adjudication in its entirety and to enter a new and different order denying the motion as to the second and sixth causes of action, but granting the motion as to the remaining nine causes of action. Plaintiffs shall recover their costs on appeal. (Cal. Rules of Court, rule 8.278(a)(1).)

ROBIE , J.

We concur:

RAYE , P. J.

NICHOLSON , J.

27