Filed 7/29/15  Pendola Family Trust Partnership v. Pan Pacific (Pine Creek), L.P. CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Nevada)

----

| | |
|---|---|
| PENDOLA FAMILY TRUST PARTNERSHIP, | C074300 |
| Plaintiff and Appellant, | (Super. Ct. No. 75175) |
| v. | |
| PAN PACIFIC (PINE CREEK), L.P. et al., | |
| Defendants and Respondents. | |

This case deals with a limited partnership that has become strained, based on the claim of the limited partner and plaintiff, Pendola Family Trust Partnership (Pendola), that it was cheated out of converting its limited partnership units in the Pine Creek Shopping Center into other real estate by defendants Pan Pacific (Pine Creek) L.P.; PK II Holdco LLC; Pan Pacific Retail Properties Inc.; Kimco Realty Corporation; Prudential Real Estate Investors; Prudential Financial Inc.; PR II PK Member LLC; and PK II PP Pine Creek GP LLC.  The facts demonstrate, however, that Pendola was attempting a

1

1031 exchange[1] to avoid tax consequences of selling its units, but that attempt failed through no fault of defendants.

Pendola could have received $3.84 million for its 6.32 percent limited partnership interest when a joint venture between Kimco Realty Corporation and Prudential Insurance Company of America merged into and became the owner of Pendola's general partner. Instead, as noted, Pendola tried to convert its units via the 1031 exchange. Although Pendola did not have a property conversion right under its partnership agreement, the Kimco/Prudential joint venture tried to accommodate Pendola and allowed it to place a guaranty on the Pine Creek Shopping Center's mortgage. Pendola agreed to do everything necessary to effectuate the 1031 exchange, including obtaining lender consent. Lender consent was required because the partnership's mortgage loan agreement contained single purpose entity covenants that precluded the partnership from buying a property to be exchanged for Pendola's units. The lender refused to consent. Still, the Kimco/Prudential joint venture continued attempting to accommodate Pendola by offering to exchange one of the joint venture's separate properties, the Angels Camp Towne Center, for Pendola's units so the single purpose entity would not be implicated. This alternative transaction failed, however, because Pendola and the Kimco/Prudential joint venture could not agree on a price for Pendola's units.

A year and one-half later, Pendola initiated this lawsuit against defendants for not converting Pendola's units. Pendola alleged breach of contract, breach of fiduciary duty, and fraud claims. The trial court correctly granted summary judgment in favor of defendants, based on the following: there was no breach of contract under the unambiguous language of the contract; there was no breach of fiduciary duty because the

---

[1]    A 1031 exchange is an "exchange of investment property to defer capital gains taxes." (*McGuire v. More-Gas Investments, LLC* (2013) 220 Cal.App.4th 512, 516, fn. 2.)

general partner owed no fiduciary duty to its limited partner, Pendola, in negotiating at arm's length; and there was no fraud because there were no misrepresentations or concealments.

While the summary judgment motion was pending, and after three and one-half years of extensive litigation, Pendola sought leave to amend its complaint a third time, adding seven new defendants and three causes of action, and almost tripling the demand amount from over $3.8 million to over $10 million. The trial court properly exercised its discretion denying leave to amend because Pendola unreasonably delayed trying to amend its complaint and defendants would be prejudiced by the amendment.

Finally, the trial court also properly exercised its discretion to partially deny Pendola's motion to tax defendants' costs because the court determined those costs were reasonably necessary to the litigation.

We affirm.

FACTUAL AND PROCEDURAL BACKGROUND

A

*Formation Of The Western/Pine Creek Limited Partnership To Own*

*25 Percent Of The Pine Creek Shopping Center*

Since 1999, the Pine Creek Shopping Center in Grass Valley has been owned by two tenants in common, owning separate 75 percent and 25 percent undivided interests.

This case is about the 25 percent tenant in common, which is a partnership originally known as Western/Pine Creek Limited Partnership. Pendola's interest in the Pine Creek Shopping Center is in the Western/Pine Creek Limited Partnership. Pendola was issued 88,498 limited partnership units, constituting its 6.32 percent interest in the Pine Creek Shopping Center (which was 25.28 percent of Western/Pine Creek Limited Partnership's 25 percent ownership). Western Properties Trust, a publically-traded real estate investment trust, was the general partner in the Western/Pine Creek Limited Partnership (owning the remaining part of the 25 percent interest in Western/Pine Creek)

3

and it also owned the entire remaining 75 percent undivided interest in the Pine Creek Shopping Center.

Thus, the ownership in the Pine Creek Shopping Center looked like this:



Under the original agreement of limited partnership, Pendola could not dissolve the Western/Pine Creek Limited Partnership or partition the Pine Creek Shopping Center. But, under certain circumstances, Pendola could convert its units into shares of Western Properties Trust, or at the election of Western Properties Trust, the cash equivalent of those shares. Pendola did not have the right to convert its units into another property. From Pendola's standpoint, however, it entered the Western/Pine Creek Limited Partnership to avoid the "debt relief taxation" from Pendola's prior financial involvement

4

in the Pine Creek Shopping Center.[2]  To that end, Western Properties Trust agreed to replace an existing loan on the Pine Creek Shopping Center with internal financing and agreed to pay Pendola's taxes on any sale of the property within the first five years.  In the original agreement of limited partnership, Pendola represented and warranted that it was a "sophisticated investor, able and accustomed to handling sophisticated financial matters for itself, particularly real estate investments, and that i[t] ha[d] a sufficiently high net worth that it d[id] not anticipate a need for the funds that it ha[d] invested in the Partnership in what it underst[ood] to be a highly speculative and liquid investment."  At the same time, Western Properties Trust (which was the general partner) was given "full, complete and exclusive discretion to manage and control" and to "make all decisions affecting the business and assets of the Partnership."  These rights expressly included placing mortgage debt on the partnership, transferring the general partner's interest to a wholly-owned subsidiary or in connection with a merger, and amending the original agreement of limited partnership.

B

*Western Properties Trust Merges Into*

*Pan Pacific Retail Properties Inc.*

Within the first year of the original agreement of limited partnership, Western Properties Trust merged into Pan Pacific Retail Properties Inc., another real estate investment trust (so now Pan Pacific Retail Properties Inc. was the new general partner). The name of the partnership was changed to Pan Pacific (Pine Creek) L.P.

Thus, the ownership in the Pine Creek Shopping Center now looked like this:

---

[2]     It is not clear (and is immaterial to this appeal) exactly what Pendola's prior financial involvement was in the Pine Creek Shopping Center.



In anticipation of the merger, Western Properties Trust and Pendola amended the original agreement of limited partnership to clarify that Pendola's units would be convertible into 54,869 shares of Pan Pacific Retail Properties Inc. (reflecting the difference in value between the shares of Western Properties Trust and the shares of Pan Pacific Retail Properties Inc.) or into the cash equivalent, at the election of Pan Pacific Retail Properties Inc. Pan Pacific Retail Properties Inc. also allocated to Pendola $3.792 million of the partnership's debt, so Pendola could continue to avoid adverse tax consequences.

## C

*Pan Pacific Retail Properties Inc. Merges With*

*The Kimco/Prudential Joint Venture*

In July 2006, Kimco Realty Corporation, KRC Acquisition Inc.,[3] Pan Pacific Retail Properties Inc., among others, entered into a plan for KRC Acquisition Inc. to merge into Pan Pacific Retail Properties Inc. and acquire its 140 properties, including the Pine Creek Shopping Center. By the time the merger closed, the Kimco/Prudential joint venture had been formed (owned 85 percent by affiliates of the Prudential Insurance Company of America and 15 percent by affiliates of Kimco Realty Corporation) to acquire the 140 properties of Pan Pacific Retail Properties Inc.. In connection with the merger, a wholly-owned subsidiary of the joint venture entities -- named PK II PP Pine Creek GP LLC -- had replaced Pan Pacific Retail Properties Inc. as the general partner of the partnership.

The partnership continued to own a 25 percent undivided interest in the Pine Creek Shopping Center, while another wholly-owned subsidiary of the Kimco/Prudential joint venture -- named PK II Pine Creek LP -- became owner of the remaining 75 percent undivided interest in the Pine Creek Shopping Center. The 75 percent tenant-in-common interest was transferred during the two-day closing through special warranty deeds, first from Pan Pacific Retail Properties Inc. to Kimco Realty Corporation on October 31, 2006, and, in turn, from Kimco Realty Corporation to PK II Pine Creek LP on November 1, 2006. The Kimco/Prudential joint venture merged into Pan Pacific Retail Properties Inc., then Pan Pacific Retail Properties Inc. assigned its interest in the

---

[3] KRC

Acquisition, Inc., was a joint venture owned 85 percent by affiliates of the Prudential Insurance Company of America and 15 percent by Kimco Realty Corporation.

partnership to the wholly-owned subsidiary of the Kimco/Prudential joint venture, which was the general partner.

Thus, the ownership in the Pine Creek Shopping Center now looked like this:



D

*Pendola Negotiates With The Kimco/Prudential Joint*

*Venture To Avoid Tax Consequences*

Pendola had two options under the merger of Pan Pacific Retail Properties Inc. with the Kimco/Prudential joint venture: (1) Pendola could exercise its original conversion right and exchange its units for $70 per unit, which was the price of the stock for Pan Pacific Retail Properties Inc. in the merger; or (2) Pendola could remain a limited partner. Both options had tax consequences. If Pendola exchanged its units for cash, Pendola would receive $3.84 million (55,689 units x $70), resulting in a tax liability of between $2.7 million to $2.8 million. If Pendola stayed in the partnership, the loan that

Pan Pacific Retail Properties Inc. allocated to Pendola would be paid off, causing a similar tax consequence.

To avoid these tax consequences, Pendola asked the Kimco/Prudential joint venture to allow Pendola to attempt a 1031 tax exchange, in which Pendola would exchange its interest in the partnership for ownership interests in a new property. Pendola's tax advisor, Kevin McBride, a certified public accountant and a lawyer with a master of law degree in taxation, was unsure whether this strategy would work. Pendola's James Richards, its long-time attorney who had known the Pendola family for over 50 years, negotiated with the joint venture on Pendola's behalf. Representing the Kimco/Prudential joint venture was the Wachtell law firm and two of its attorneys, David Shapiro and Scott Golenbock.

During these negotiations, Pendola's Richards was informed in October 2006 that the partnership would place a $31 million mortgage loan on the Pine Creek Shopping Center. Pendola asked if it could provide a guaranty on the loan to maintain its debt position, because without it, Pendola would incur tax consequences for debt forgiveness. In exchange, Pendola agreed to give up any rights it had under the original agreement of limited partnership to proceeds from the mortgage.

E

*Pendola Partially Guarantees The Mortgage Loan*

The Wachtell law firm drafted the guaranty for the last $3.7 million of the $31 million mortgage loan for Pendola at Pendola's request. The guaranty specifically stated that the partnership had obtained the mortgage loan and referred to several documents that the partnership executed in connection with that loan, including a promissory note, deed of trust, assignment of leases and rents, and security agreement.

Richards and McBride reviewed the guaranty on behalf of Pendola. Richards did not review or request the loan agreement or related documents but later stated, "he wished he had read them." McBride also did not review the loan agreement or related

documents. The manager of Pendola, William Pendola Jr., signed the guaranty, but he did not communicate with anyone at Kimco about the guaranty. He also did not review the loan agreement or related documents.

On November 1, 2006, the partnership (as the 25 percent owner) and PK II Pine Creek LP executed the loan agreement and related documents in which Merrill Lynch lent $31 million to the partnership and PK II Pine Creek LP and placed a mortgage on the Pine Creek Shopping Center.

On November 13, 2006, Pendola executed the guaranty.

F

*The Third Amendment To The Original Agreement Of Limited Partnership*

Wachtell also provided to Richards a first draft of a proposed third amendment to the agreement of limited partnership. The conversion right in section 8.4 of the third amendment was revised to reflect the parties' agreement on Pendola's desired 1031 exchange.

In pertinent part, the third amendment provides as follows: Paragraph 8.4(g)(iii) of the third amendment states, "[t]he Converting Group shall be solely responsible to obtain and deliver all Conversion Deliverables and to satisfy all Conversion Conditions, including, as applicable, negotiating all Conversion Property Purchase Documents, obtaining all consents, coordinating all due diligence (including third party reports), at the Converting Group's sole cost and expense." One of the conversion conditions included providing "evidence of all consents . . . from . . . third parties (including lenders) which are necessary to consummate the series of transactions arising out of the exercise of a Conversion Right." The third amendment defined the "Converting Group" as "[t]he Limited Partners that submit a valid Conversion Notice," here Pendola. The third amendment gave Pendola until April 31, [*sic*] 2007, to satisfy the conversion conditions and give the general partner notice of the conversion and then until October 31, 2007, to

10

close on the conversion. After October 31, 2007, the general partner "ha[d] the right" to purchase Pendola's units for $70, but it did not have to.

In section 3.2(b), each partner "represent[ed] and warrant[ed]" that each partner had the necessary organizational "authori[ty]" from its own "partner(s), committee(s), trustee(s), beneficiaries, directors and or shareholder(s)" to enter into the business of the partnership.

In article XII of the third amendment, the parties agreed to the following entitled, "Arm's Length Agreement": "This Agreement is the product of negotiations between the parties hereto represented by counsel and any result of construction relating to interpretation against the drafter of an agreement shall not apply to this Agreement and are expressly waived."

Pendola's Richards reviewed the third amendment before it was executed by Pendola. His only comments related to the "number of Pendola's limited partnership Units, the conversion price of $70, and the reserved cash."

G

*Failure Of The Conversion Conditions*

To effectuate the 1031 exchange, Pendola executed a purchase agreement for a retail center known as Red Rock Plaza in Tulare County.

On December 27, 2006, Pendola's Richards sent attorney Golenbock of the Kimco/Prudential joint venture a "Notice of Exercise of Conversion Right" requesting that the general partner coordinate with the partnership to buy Red Rock Plaza pursuant to section 8.4 of the third amendment.

On January 11, 2007, Golenbock e-mailed Richards that the current lender would not consent to the exercise of section 8.4 of the third amendment because the single purpose entity covenants in the partnership's mortgage loan agreement prevented the partnership from acquiring other properties. Pendola still wanted to have some "tax-free exit" from the partnership, so Richards asked the general partner to request that the lender

11

waive any loan defaults under the loan agreement that might arise out of the purchase of Red Rock Plaza. The lender refused.

H

*The Parties Attempt An Alternative Transaction*

Kimco/Prudential joint venture's Golenbock and Pendola's Richards tried to think of "potential structures for an exchange that might work." One option was for Pendola to exchange its units for another property already owned by the Kimco/Prudential joint venture. Pendola suggested purchasing Angels Camp Towne Center from the Kimco/Prudential joint venture. Then, the partnership would distribute a portion of Angels Camp Towne Center to Pendola in redemption of its interest valued at approximately $3.8 million and Pendola would use cash to purchase the remainder of Angels Camp Towne Center, which in total was valued at approximately $11 million.

On April 27, 2007, Richards e-mailed Golenbock a "Notice, election to convert, and identification of . . . redemption property" identifying the Angels Camp Towne Center. Pendola and the limited partnership entered into a purchase and sale agreement for the Angels Camp Towne Center. The general partner intended to proceed with the sale of the Angels Camp Towne Center, but during Pendola's "due diligence" period, Pendola claimed there were dilapidated conditions at the Angels Camp Towne Center, including "roofing, sewer and water leaks." Pendola wanted a decrease in price, but the parties could not agree on a revised price. So, on December 27, 2007, Pendola terminated the purchase agreement.

On March 3, 2008, Richards wrote a letter to Golenbock notifying him Pendola intended to cash in its 54,869 partnership units at $70 per unit. Golenbock responded that the shares were worth less now, so the general partner was declining to purchase Pendola's units. Pendola remains the limited partner.

12

# I

## *The Lawsuit*

On August 3, 2009, Pendola filed a complaint against four named defendants alleging the following five causes of action:  (1) breach of contract; (2) fraud for intentional misrepresentation; (3) promissory fraud -- promise without intent to perform; (4) promissory fraud -- hidden intention not to comply with the covenant of good faith and fair dealing; and (5) constructive fraud -- breach of fiduciary duty.  These causes of action arise out of the negotiation and implementation of the third amendment.  The four named defendants were Pan Pacific (Pine Creek) L.P., PK II Holdco LLC, Pan Pacific Retail Properties Inc., and Kimco Realty Corporation.  The complaint sought over $3.8 million in damages.

In April 2010, Pendola filed a first amended complaint.  The defendants and causes of action remained the same.

In January 2012, Pendola filed a second amended complaint adding four more defendants, Prudential Real Estate Investors, Prudential Financial Inc., PR II PK Member LLC, and PK II PP Pine Creek GP, LLC.

In November 2012, defendants moved for summary judgment.

In February 2013, Pendola filed its motion for leave to file a third amended complaint.  The proposed third amended complaint sought to add seven defendants and three causes of action.  It also nearly tripled the damages Pendola was seeking from defendants from over $3.8 million to over $10 million.  The three new causes of action had to do with the merger of Pan Pacific Retail Properties Inc. and Kimco Realty Corporation and a 23-year-old cotenancy agreement signed by Western Investment Real Estate Trust and Connelly Development Inc.  Connelly Development Inc. signed the cotenancy agreement on behalf of Pine Creek Shopping Center Associates.  Pendola wanted to add the seven new defendants because it recently learned "the true names of

13

the Doe defendant entities." The trial court found that Pendola had the documents that supported its motion eight months before it filed the motion.

The trial court denied Pendola's motion for leave to file a third amended complaint for two reasons: (1) Pendola "ha[d] not sufficiently explained the delay in filing the present motion"; and (2) "the amendment will severely prejudice defendants."

In June 2013, the trial court granted the motion for summary judgment.

Defendants as the prevailing party then submitted a memorandum of costs. Pendola filed a motion to tax costs. The trial court granted the motion to tax certain costs and denied the motion as to other costs.

Pendola timely appeals from the resulting judgment, claiming the trial court erred in granting summary judgment, erred in denying its motion for leave to file a third amended complaint, and erred in denying any part of its motion to tax costs.

DISCUSSION

I

*The Trial Court Properly Granted Summary Judgment*

*On Each Of Pendola's Causes Of Action*

Pendola contends the trial court erred in granting summary judgment because the court improperly shifted the burden of producing evidence to Pendola and because Pendola produced substantial evidence making a prima facie showing of a genuine issue of material fact as to each cause of action.

We begin by setting forth the standards on summary judgment and then explain why the trial court was correct in granting summary judgment on each of Pendola's causes of action.

A

*Standard Of Review On Summary Judgment*

A motion for summary judgment should be granted if "there is no triable issue as to any material fact" and the moving party is entitled to judgment as a matter of law.

14

(Code Civ. Proc., § 437c, subd. (c).)  A defendant meets its burden of showing that a cause of action has no merit if it shows that one or more elements of the cause of action cannot be established, or that there is a complete defense.  (Code Civ. Proc., § 437c, subd. (p)(2).)  Once the defendant has met that burden, the burden shifts to the plaintiff to show that a triable issue of material fact exists.  (*Ibid*.)  "[I]f a plaintiff who would bear the burden of proof by a preponderance of evidence at trial moves for summary judgment, he must present evidence that would require a reasonable trier of fact to find any underlying material fact more likely than not.  By contrast, if a defendant moves for summary judgment against such a plaintiff, he may present evidence that would require such a trier of fact *not* to find any underlying material fact more likely than not." (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 845.)

On appeal, we view the evidence in the light most favorable to the party opposing summary judgment.  (*Lane v. City of Sacramento* (2010) 183 Cal.App.4th 1337, 1339.)

Pendola contends the trial court misunderstood its role in reviewing the summary judgment motion, failing to consider the evidence and inferences therefrom in the light most favorable to the party opposing summary judgment.  Not so.

The trial court's ruling properly quoted and cited the standard of review, applied that standard in construing the undisputed facts, and came to a conclusion contrary to that argued by Pendola.  As to the law and standard of review the trial court followed, no error appears.  Now we turn to the substantive claims asserted by Pendola, which are discussed below.

B

*The Trial Court Properly Granted Summary Judgment*
*On Pendola's Breach Of Contract Cause Of Action*

Pendola alleged in its complaint that defendants breached their contract obligations under paragraphs 8.4 and 8.5 of the third amendment to the original agreement of limited partnership in refusing to comply with the terms of these

15

paragraphs, including failing to perform certain conditions, covenants, and promises to which they agreed and failing to approve the conversion deliverables to enter into the escrow arrangements in response to Pendola's attempted conversion. Pendola repeats that same claim here, contending the trial court misconstrued the contract.

The undisputed and unambiguous contract language provides otherwise and controls here. (See Civ. Code, § 1638 ["The language of a contract is to govern its interpretation, if the language is clear and explicit, and does not involve an absurdity"]; *Founding Members of the Newport Beach Country Club v. Newport Beach Country Club, Inc.* (2003) 109 Cal.App.4th 944, 956 [the objective words of the contract control rather than the subjective intent of one of the parties].)

Paragraph 8.4(g)(iii) of the third amendment states, "[t]he Converting Group shall be solely responsible to obtain and deliver all Conversion Deliverables and to satisfy all Conversion Conditions including, as applicable, negotiating all Conversion Property Purchase Documents, obtaining all consents, coordinating all due diligence (including third party reports), at the Converting Group's sole cost and expense." The third amendment defined the "Converting Group" as "[t]he Limited Partners that submit a valid Conversion Notice," so here Pendola, because it was seeking the conversion.

The trial court correctly ruled, "It is clear from the Third Amendment that [Pendola] alone had the responsibility of obtaining the approvals. [Pendola] has failed to demonstrate that it delivered the Conversion Condition. Without fulfilling that condition precedent, Defendant(s) were not required to perform the next step, i.e., enter into an escrow arrangement. Thus, the cause of action fails as a matter of law."

The trial court was correct because section 8.4(a) of the third amendment states that Pendola's " 'conversion right' " (which was defined in section 8.4(a) as the right "to require the Partnership to acquire all . . . of its Limited Partnership Units in exchange for all of the outstanding membership interests in one or more of the Conversion LLC's") was "[s]ubject to the satisfaction of the Conversion Conditions." The third amendment in

16

the "Defined Terms" section defines "Conversion Conditions" to "mean[], with respect to any exercise of Conversion Rights pursuant to section 8.4, satisfaction of each of the following conditions [¶] . . . [¶] evidence of all consents, permits, licenses, approvals or authorizations from governmental authorities or other third parties (including lenders) which are necessary to consummate the series of transactions arising out of the exercise of a Conversion Right."  Thus, the satisfaction of the conversion conditions was a condition precedent to Pendola's conversion right.  (See *Behrman v. Barto* (1880) 54 Cal. 131, 134 [requirement that one party perform its covenants is a condition precedent under a contract].)

Pendola responds by asserting that the term "as applicable" in paragraph 8.4(g)(iii) of the third amendment inserted ambiguity into the paragraph, leaving it open to debate as to whether Pendola was required to satisfy "all" conditions or only those "applicable" to Pendola.  Pendola further argues that it was a question of fact as to whether obtaining lender consent from " 'Kimco's lender' "[4] was a condition applicable to Pendola.

Pendola's assertion is not a reasonable reading of the third amendment for at least two reasons.

One, Pendola is inserting an extra phrase into paragraph 8.4(g)(iii) of the third amendment, namely, as applicable "to Pendola."  Rather, "as applicable" without a reference to the party reasonably means those "conversion conditions" that, by that term's definition, "are necessary to consummate the series of transactions arising out of the exercise of a Conversion Right."  These conditions expressly include "consents, permits, licenses, approvals or authorizations from governmental authorities or other third parties (including lenders) which are necessary to consummate the series of transactions

---

**4**    The combined borrower under the mortgage loan was the partnership and PK II Pine Creek LP, not Kimco.

17

arising out of the exercise of a Conversion Right." Thus, as applicable here, the conversion conditions included obtaining consent of the lender.

And two, Pendola's reading of the third amendment that it, Pendola (as opposed to another entity satisfying the conditions), was responsible for satisfying only some of the conditions contradicts the beginning of the phrase which includes the language about applicable conditions. (See *McCaskey v. California State Automobile Assn.* (2010) 189 Cal.App.4th 947, 970 ["A contract is to be construed as a whole, 'so as to give effect to every part, if reasonably practicable, each clause helping to interpret the other' "].) Specifically, section 8.4(g)(iii) of the third amendment states that "[t]he Converting Group," i.e., Pendola, "shall be *solely responsible* to obtain and deliver all Conversion Deliverables and *to satisfy all Conversion Conditions* including, as applicable, negotiating all Conversion Property Purchase Documents, *obtaining all consents*, coordinating all due diligence (including third party reports), at the Converting Group's sole cost and expense." (Italics added.) In fact, the next sentence sets forth the obligation of the general partner with respect to the conversion conditions, i.e., "to cooperate reasonably with the Converting Group."

Faced with the unambiguous language of section 8.4(g)(iii) of the third amendment, Pendola next contends that even if it were obligated under the amendment to obtain lender consent, "only Kimco engaged in efforts to obtain lender consent after it executed the Third Amendment, and never mentioned, requested, or informed Pendola it was its responsibility." (Underlining omitted.) This fact is irrelevant. The general partner cannot be liable for Pendola's failure to even attempt to fulfill its contractual obligations. (*Rains v. Arnett* (1961) 189 Cal.App.2d 337, 347 ["A person cannot take advantage of his own act or omission to escape liability"].)

Pendola also claims the trial court failed to consider the general partner's representations in sections 3.2(b) and 6.1 of the third amendment that no consents were required. Nothing in these sections states anything like that.

18

In section 3.2(b) of the third amendment, each partner "represent[ed] and warrant[ed]" that each partner had the necessary organizational "authori[ty]" from its own "partner(s), committee(s), trustee(s), beneficiaries, directors and/or shareholder(s)" to enter into the business of the partnership. This representation had been in the partnership agreement from the beginning of Pendola's relationship with Western Properties Trust as the general partner in 1999, long before the third amendment. It was merely a representation by each partner, including Pendola and the general partner, that each had approved the agreement according to its own internal corporate or partnership requirements and that the partnership agreement did not violate that partner's other material agreements.

As to Section 6.1 of the third amendment, it does not contain any representations. It sets forth the "Management of the Partnership" and states what the "powers of the General Partner shall include." It lists the broad powers that Pendola, as the limited partner, granted to the general partner to manage the partnership. Those powers included the authority "to borrow money for the Partnership . . . and secure such indebtedness by mortgage, deed of trust, pledge or other lien in the Partnership's assets."

Section 6.1 of the third amendment actually enabled the general partner to do exactly what Pendola now claims was wrongful: place a mortgage on the Pine Creek Shopping Center and enter into the $31 million loan agreement (including the single purpose entity covenants). Thus, even if it is true, as Pendola argues, the $31 million loan agreement restricted what the general partner could do with respect to the partnership, Pendola granted the general partnership the power to agree to those restrictions.

19

## C

### *The Trial Court Properly Granted Summary Judgment*
### *On Pendola's Breach Of Fiduciary Duty Cause Of Action*

Pendola alleged in its complaint that defendants breached their fiduciary duty to Pendola by making fraudulent promises and intentional misrepresentations. The trial court properly concluded that the general partner "was not required to protect [Pendola's] interest" while negotiating the third amendment under the "clear and unambiguous language of the partnership agreement" and in any event, Pendola "failed to demonstrate any fraudulent promises or intentional misrepresentations." The trial court was correct.

Defendants did not owe Pendola a fiduciary duty when negotiating the third amendment. Parties who are adverse, negotiating parties are not fiduciaries to one another. (*Persson v. Smart Inventions, Inc.* (2005) 125 Cal.App.4th 1141, 1162.) "[W]e reject the notion that a confidential relationship may arise, in the course of arms-length . . . negotiations between two [parties], both of whom are represented by counsel and accountants . . . ." (*Ibid.*) Pendola's tax advisor was Kevin McBride, a certified public accountant and a lawyer with a master of law degree in taxation. Pendola also had James Richards, its long-time attorney, negotiating on its behalf. On the other side representing the Kimco/Prudential joint venture was the Wachtell law firm and two of its attorneys, David Shapiro and Scott Golenbock. Here, before the merger of Pan Pacific Retail Properties Inc. and the Kimco/Prudential joint venture, the joint venture entities and Pendola were strangers. As Pendola admitted, they were all engaged in "arms-length" negotiations about forming the partnership. Specifically, in article XII of the third amendment, Pendola expressly agreed to the following entitled, "Arm's Length Agreement": "This Agreement is the product of negotiations between the parties hereto represented by counsel and any result of construction relating to interpretation against the drafter of an agreement shall not apply to this Agreement and are expressly waived." This provision was not something that was simply carried over from the original

20

partnership agreement, but it was a reflection of what transpired during the negotiation of the third amendment.

We also reject Pendola's contention in its opening brief that the trial court "improperly looked to Delaware law as legal authority to the effect the fiduciary duties of 'loyalty and care' owed a limited partner can be limited." (Fn. omitted.) The third amendment specifically stated, "This agreement shall be governed by and constructed in accordance with the laws of the State of Delaware." Thus, the trial court was required to look to Delaware law in construing the fiduciary duty claims. (See *Nedlloyd Lines B.V. v. Superior Court* (1992) 3 Cal.4th 459, 470 ["a valid choice-of-law clause, which provides that a specified body of law 'governs' the 'agreement' between the parties, encompasses all causes of action arising from or related to that agreement"].)

Any fiduciary duties a general partner owes to a limited partner "may be . . . restricted or eliminated by provisions in the partnership agreement; provided that the partnership agreement may not eliminate the implied contractual covenant of good faith and fair dealing." (6 Del. Code, § 17-1101, subd. (d).) As the trial court noted, the third amendment did just that, namely, appropriately restricted any fiduciary duties owed. Specifically, section 6.4(b) of the third amendment stated as follows: "The Limited Partners expressly acknowledge that the General Partner is acting on behalf of the Partnership, and the General Partner's shareholders or interest holders . . . , and that the General Partner is under no obligation to consider the separate interests of the Limited Partner." Thus, as the trial court noted, "the clear and unambiguous language of the [third amendment] provides that the General Partner was not required to protect [Pendola's] interests."

The power of attorney provision in the third amendment does not change this analysis, contrary to Pendola's contention on appeal. The power of attorney provision in the third amendment gives the general partner power to "sign, acknowledge, swear to, deliver, file and record . . . any and all documents, certificates, and instruments as may be

21

deemed necessary or desirable by the General Partner to carry out fully the provisions of this Agreement and the [Delaware Revised Uniform Limited Partnership] Act." It does not place any fiduciary obligations on the general partner. And, Pendola's claims are not based on any documents being "sign[ed], acknowledge[d], sw[orn] to, deliver[ed], file[d] [or] record[ed]" by the general partner on behalf of Pendola.

For all these reasons, the trial court properly granted summary judgment on Pendola's breach of fiduciary duty cause of action.

D

*The Trial Court Properly Granted Summary Judgment*

*On Pendola's Fraud Cause Of Action*

Pendola alleged in its complaint that defendants committed fraud on Pendola by making false and fraudulent oral and written representations and concealments that induced Pendola to enter into the third amendment. The trial court properly concluded that Pendola "failed to demonstrate any misrepresentations or concealment."

"The elements of fraud are a misrepresentation, knowledge of its falsity, intent to defraud, justifiable reliance and resulting damage. [Citation.] Fraud causes of actions must be pled with specificity in order to give notice to the defendant and to furnish him or her with definite charges. [Citation.] In drafting the complaint, ' "(a) [g]eneral pleading of the legal conclusion of 'fraud' is insufficient; the facts constituting the fraud must be alleged. (b) Every element of the cause of action for fraud must be alleged in the proper manner (i.e., factually and specifically), and the policy of liberal construction of the pleadings . . . will not ordinarily be invoked to sustain a pleading defective in any material respect." ' " (*Gil v. Bank of America, N.A.* (2006) 138 Cal.App.4th 1371, 1381.)

As a preliminary matter, Pendola incorrectly claims that a fraud cause of action is never subject to summary judgment because fraud is always a question of fact. Not so. For example, this court affirmed a grant of summary judgment against the plaintiff on his fraud cause of action where the defendant "successfully showed [the plaintiff] could not

22

have justifiably relied on [the alleged fraudulent mis]representations under the circumstances." (*Hinesley v. Oakshade Town Center* (2005) 135 Cal.App.4th 289, 291, 303.)

> 1. *Pendola Did Not Present Evidence Of Any Specific Misrepresentation Or Who Made Any Misrepresentations*

In its complaint, Pendola alleged the following misrepresentations: "Defendants Kimco . . . made oral and written false and fraudulent misrepresentations in written memorandums, emails, draft agreements and agreements as well as other writings to Pendola . . . that induced Pendola to enter into the [third amendment]." (Bolding omitted.) "The representations and deceit were made and perpetrated by defendants' attorneys, agents, representatives, employees, servants and/or related parties including . . . Scott W. Golenbock, Esq., Jim Caserio, David E. Shapiro, Matthew Golden, Howard Overton, Bruce Rubenstein, Sara Lee, and others known to the Defendants . . . ." (Bolding omitted.) The misrepresentations Pendola alleged in the complaint (and restates in its opening brief) included terms in the third amendment that Pendola in its opening brief contends were misrepresented to it by Kimco.

The 16 items that Pendola lists in its opening brief as "misrepresentations" or "concealments" are neither, as they are terms Pendola agreed to in the third amendment. "[O]ne who assents to a contract is bound by its provisions and cannot complain of unfamiliarity with the language of the instrument" (*Madden v. Kaiser Foundation Hospitals* (1976) 17 Cal.3d 699, 710), or more particularly here, that the language in the agreement was somehow a fraudulent misrepresentation.

In fact, Pendola has identified only three people who may have communicated with defendants: Pendola's manager (William Pendola Jr.), Pendola's long-time attorney, James Richards, and its tax advisor, Kevin McBride. As to McBride, he did not review the third amendment before it was executed by Pendola, and he did not recall that any one of "Kimco's . . . accountants or attorneys had made representations about the tax

23

consequences of this transaction." As to William Pendola, he stated that "no misrepresentations were made by Mr. Golenbock, James Caserio [the other counsel to the Kimco-Prudential joint venture], Mr. Shapiro (of Wachtell), or Mr. Golden (of Kimco)." As to Richards, he claims that Shapiro and/or Rubenstein[5] "should have been 'more revealing' to Pendola about the terms of the Loan Agreement," and he was "disappointed" that they were not more "revealing," and "they didn't take care of us." But Richards could not identify a specific person who misrepresented facts to him.

2.   *Defendants Had No Duty To Disclose Particular Terms Of The Loan Agreement To Pendola*

Pendola alleged in its complaint that Kimco concealed terms of the loan agreement that affected the conversion right. Fraudulent deceit includes "[t]he suppression of a fact, by one who is bound to disclose it, or who gives information of other facts which are likely to mislead for want of communication of that fact." (Civ. Code, § 1710, factor (3); see *Cicone v. URS Corp.* (1986) 183 Cal.App.3d 194, 200, fn. 1 [citing Civ. Code, § 1710 regarding deceit for a fraud cause of action].) Concealment rises to the level of fraud if any of the defendants had a duty to disclose specific terms of the loan agreement to Pendola. (See *LiMandri v. Judkins* (1997) 52 Cal.App.4th 326, 336-337 [the circumstances in which nondisclosure may be actionable presupposes there exists between the parties some relationship in which a duty to disclose arises].)

"There are 'four circumstances in which nondisclosure or concealment may constitute actionable fraud: (1) when the defendant is in a fiduciary relationship with the plaintiff; (2) when the defendant had exclusive knowledge of material facts not known to the plaintiff; (3) when the defendant actively conceals a material fact from the plaintiff;

---

[5]   Bruce Rubenstein was the general counsel of Kimco Realty Corporation.

24

and (4) when the defendant makes partial representations but also suppresses some material facts.' " (*LiMandri v. Judkins*, *supra*, 52 Cal.App.4th at p. 336.)

We have already discussed that there was no fiduciary duty here between Pendola and defendants. As to the remaining three circumstances, defendants did not have exclusive knowledge of the terms of the loan agreement nor did they conceal these terms from Pendola. Rather, Richards knew as early as October 2006 that the partnership was going to place a $31 million mortgage loan on the property. Pendola was allowed to execute a guaranty with respect to the mortgage loan. The guaranty specifically stated that the partnership had obtained the mortgage loan and referred to several documents that the partnership executed in connection with that loan, including a promissory note, deed of trust, assignment of leases and rents, and security agreement.

Despite reviewing the guaranty on behalf of Pendola and knowing about the loan agreement and these documents, neither William Pendola Jr. nor Richards asked any defendant about the terms of the loan agreement nor did they ask for an opportunity to review it, although Richards later stated, "he wished he had read them." And William Pendola Jr. admitted he never communicated with anybody at Kimco regarding the guaranty. Pendola's indifference about the terms of the loan agreement and related documents, where it knew about their existence, did not obligate defendants to explain or provide details about these documents to Pendola. (*Assilzadeh v. California Federal Bank* (2000) 82 Cal.App.4th 399, 405, 416 [appellate court upheld summary judgment because the broker did not have a duty to disclose details of a construction defect lawsuit to the buyer when the buyer could have learned the details].)

As the trial court here correctly found: Pendola "failed to demonstrate any misrepresentations or concealment. The undisputed material facts provide that the original partnership agreement in effect when the mortgage loan was issued authorized the partnership to borrow money without limitation and without Pendola's consent; Pendola was seeking to have approximately $3.7 million in debt on the property for tax

25

purposes; when the loan was issued, Pendola was allowed to post a $3.7 million guaranty as an accommodation; Pendola executed the guaranty; Pendola's counsel (Richards) reviewed the guaranty; the guaranty referenced the underlying loan documents; and, neither Pendola nor his agents requested or reviewed the underlying loan documents."

### 3. *Pendola Presented No Evidence Of Defendants' Intent To Defraud*

The third element of a fraud cause of action is "intent to defraud." (*Gil v. Bank of America, N.A.*, *supra*, 138 Cal.App.4th at p. 1381.) Pendola presented no evidence to infer defendants' intent to defraud Pendola. To the contrary, here the general partner agreed to the conversion right in the third amendment to accommodate Pendola's attempt to avoid tax liabilities. And the general partner continued to cooperate with Pendola on a tax-free conversion of its limited partnership interests for 11 months after the lender consent condition could not be satisfied.

### 4. *Pendola Presented No Evidence That It Justifiably Relied On Any Alleged Misrepresentation*

The fourth element of a fraud cause of action is "justifiable reliance." (*Gil v. Bank of America, N.A.*, *supra*, 138 Cal.App.4th at p. 1381.) The trial court here correctly determined that Pendola could not have justifiably relied on any alleged misrepresentations because Pendola's lawyers and accountants failed to review the critical documents. Specifically, the court found, "[T]he mere facts that [Pendola] and [its] agents failed to review the underlying loan documents demonstrates that no justifiable reliance can be found under the facts of this case."

Here, Pendola was represented by its tax advisor McBride, a certified public accountant and a lawyer. Pendola also had James Richards, its long-time attorney, representing it and negotiating on its behalf. Richards was an attorney with 40 years' experience as a lawyer, the last 10 of which had been in "transactions, negotiation, real estate things, commercial stuff." He was also a licensed real estate broker. While Richards said he relied on the other side's attorneys representing the Kimco/Prudential

26

joint venture, David Shapiro and Scott Golenbock from the Wachtell law firm, because "they're from Harvard and [Yale and] Wharton and all this jazz," Pendola's representatives cannot invoke their purposeful ignorance in not reading the at-issue documents to support a claim of justifiable reliance. (*Marin Storage & Trucking, Inc. v. Benco Contracting & Engineering, Inc.* (2001) 89 Cal.App.4th 1042, 1049 ["A party cannot avoid the terms of a contract on the ground that he or she failed to read it before signing"]; *Rosenthal v. Great Western Fin. Securities Corp.* (1996) 14 Cal.4th 394, 423 ["One party's misrepresentations as to the nature or character of the writing do not negate the other party's apparent manifestation of assent, if the second party had 'reasonable opportunity to know of the character or essential terms of the proposed contract.' [Citation.] If a party, with such reasonable opportunity, fails to learn the nature of the document he or she signs, such 'negligence' precludes a finding the contract is void for fraud in the execution"].) As we have noted, neither William Pendola Jr. nor Richards asked any defendants about the terms of the loan agreement nor did they ask for an opportunity to review it, although Richards later stated, "he wished he had read them." Moreover, William Pendola Jr. acknowledged he was not tricked into entering into the third amendment. The trial court properly held "no justifiable reliance can be found under the facts of this case."

E

*There Is No Basis On Which To Impose Alter Ego Liability*

As we have explained in our discussion above, the trial court correctly concluded that Pendola had not raised triable issues of material fact to defeat summary judgment on Pendola's causes of action for breach of contract and fraud against the general partner. Nevertheless, Pendola on appeal contends that who is the general partner and who are the parties to the third amendment remains a disputed issue of material fact. It alleges that "Kimco Is The True General Partner Of Pine Creek Directly or By Application of Principles of Agency of the Alter Ego Doctrine and a Party to the Third Amendment."

27

(Underlining omitted.) Even if Kimco is a party to the loan agreement or the third amendment, no cause of action against Kimco would lie for breach of contract or fraud, because "[a]n alter ego defendant has no separate primary liability to the plaintiff. Rather, plaintiff's claim against the alter ego defendant is identical with that claimed by plaintiff against the already-named defendant." (*Hennessey's Tavern, Inc. v. American Air Filter Co.* (1988) 204 Cal.App.3d 1351, 1358.) Thus, where Pendola has not proved the underlying claim against the primary defendant, a ruling on an alter ego theory is "moot." (*R & B Auto Center, Inc. v. Farmers Group, Inc.* (2006) 140 Cal.App.4th 327, 368.)

F

*Defendants' Summary Judgment Motion*

*Complied With Procedural Requirements*

Pendola contends that defendants' summary judgment motion was "littered with numerous procedural deficiencies" that made Pendola's "Task Nearly Impossible And Constitute[d] Grounds For Reversal." Pendola is wrong.

Pendola takes issue with defendants' separate statement of undisputed material facts and asserts that defendants "do not state the actual exhibit reference where the actual depositions can be found within Defendants' supporting evidence." Pendola claims defendants' deficiencies contravene Code of Civil Procedure section 437c, subdivision (b)(1) which mandates, "The motion shall be supported by affidavits, declarations, admissions, answers to interrogatories, depositions, and matters of which judicial notice shall or may be taken. The supporting papers shall include a separate statement setting forth plainly and concisely all material facts which the moving party contends are undisputed. Each of the material facts stated shall be followed by a reference to the supporting evidence. The failure to comply with this requirement of a separate statement may in the court's discretion constitute a sufficient ground for denial of the motion." Pendola further contends defendants' deficiencies contravene California

28

Rules of Court, rule 3.1350(d), (h) "by not referencing the exhibit where the evidence in support of the fact can be located."

The record belies Pendola's assertions. For example, even on the first page of the memorandum of points and authorities in support of defendants' summary judgment motion, defendant cites two facts and each fact is supported by deposition testimony, page and line citations, and the exhibit number where the deposition testimony can be found. That is the case with virtually all of defendants' citations to facts throughout its motion. Simply put, there was no procedural basis on which the trial court should have denied defendants' summary judgment motion.

## II

*The Trial Court Acted Well Within Its Discretion In Denying*

*Pendola's Motion For Leave To File A Third Amended Complaint*

The trial court denied Pendola's motion for leave to file a third amended complaint for two reasons: (1) Pendola "ha[d] not sufficiently explained the delay in filing the present motion"; and (2) "[t]he amendment will severely prejudice defendants." The court acted well within its discretion in denying the motion for these reasons. (*Flores v. Department of Corrections & Rehabilitation* (2014) 224 Cal.App.4th 199, 209 [standard of review].)

## A

*Pendola Unreasonably Delayed Filing*

*Its Motion For Leave To File A Third Amended Complaint*

On February 13, 2013, Pendola filed its motion for leave to file a third amended complaint. The proposed third amended complaint sought to add seven defendants and three causes of action. The three new causes of action had to do with the merger of Pan Pacific Retail Properties Inc. and Kimco Realty Corporation and a 23-year-old cotenancy agreement signed by Western Investment Real Estate Trust and Connelly Development Inc. Connelly Development Inc. signed the cotenancy agreement on behalf of Pine Creek

29

Shopping Center Associates. The trial court found that Pendola had the documents that supported its motion eight months before it filed the motion. Pendola wanted to add the seven new defendants because it recently learned "the true names of the Doe Defendant entities."

The facts show Pendola could have obtained the documents and information that it believed was critical to its new claims much earlier than February 2013, which is when it filed its motion for leave to file its third amended complaint. In February 2011, two years before the motion for leave to file the third amended complaint, the trial court had ordered defendants to produce for deposition the person most knowledgeable regarding the merger of Pan Pacific Retail Properties Inc. and Kimco Realty Corporation. They did, but Pendola declined to take this deposition and instead three to four months later, in April and June 2011, Pendola served new deposition notices asking for the person most knowledgeable regarding the merger of Pan Pacific Retail Properties Inc. and Kimco Realty Corporation. In July 2011, defendants responded in writing to the deposition notices and also identified the two most knowledgeable persons, -- Kimco Realty Corporation officer Matthew Golden, and Kimco Realty Corporation's outside counsel in the merger, Scott Golenbock of Wachtell. But Pendola chose not to take Golenbock's deposition until 15 months later, in October 2012.[6]

Similarly, the 23-year-old cotenancy agreement, which Pendola sought to add to the complaint through a breach of contract claim and an imposition of constructive trust claim in the motion for leave to file the third amended complaint, was produced by Kimco Realty Corporation in May 2012 in response to Pendola's second set of requests for production. And Pendola's own witnesses, William Pendola Jr. and Kevin McBride, testified in depositions that they were aware of accounting records that related to the new

---

[6]     At that time in October 2012, Pendola also deposed Bruce Rubenstein, the general counsel of Kimco Realty Corporation, but did not depose Matthew Golden.

claims under the cotenancy agreement as early as 2006 and 2007 because they received quarterly reports relating to the cotenancy agreements during those years. The trial court therefore was within its discretion to find that Pendola unreasonably delayed in adding these claims.

The trial court was also within its discretion to find that adding the seven defendants was no reason to allow Pendola leave to file the third amended complaint. Pendola wanted to add the seven new defendants because it recently learned "the true names of the Doe Defendant entities." In the declaration of Pendola's attorney supporting its motion for leave to file the third amended complaint, the attorney stated he became aware of the "true names and proper parties to this litigation" on October 18, 2012. But, as the trial court correctly noted, Pendola did not need leave to substitute named defendants for the Doe defendants. Pendola simply could have substituted those names without leave of court. Its timely failure to do so was another reasonable basis for the trial court's finding of unwarranted delay. (*A.N. v. County of Los Angeles* (2009) 171 Cal.App.4th 1058, 1066-1067) [there is "an implicit requirement that a plaintiff may not 'unreasonably delay' his or her filing of a Doe amendment after learning a defendant's identity"].)

B

*Granting Pendola Leave To File A Third Amended*

*Complaint Would Prejudice Defendants*

The trial court was also within its discretion to deny Pendola leave to file its third amended complaint because "the amendment will severely prejudice defendants." The record provides ample support for the trial court's finding and refutes Pendola's claim on appeal that the proposed third amended complaint did "not alter the nature of Pendola's claims previously alleged." The proposed third amendment added three new theories of relief and seven additional defendants. Some of Pendola's new claims were based on a cotenancy agreement that was 23 years old and to which it was not even a party. It also

31

almost tripled the amount of claimed damages to over $10 million. If the amendment had been permitted, the trial would have been further delayed because the amendments would have triggered demurrers by the new defendants, additional written discovery, possibly depositions, and a new summary judgment motion (which defendants stated in the trial court they would have filed). The trial court acts within its discretion in denying leave to file an amended complaint, where the amendment would change the complexity of the case, require additional depositions and discovery, thereby extending the trial date. (*M&F Fishing, Inc. v. Sea-Pac Ins. Managers, Inc.* (2012) 202 Cal.App.4th 1509, 1536.)

III

*The Trial Court Acted Within Its Discretion In*

*Partially Denying Pendola's Motion To Tax Costs*

The trial court here partially denied and partially granted Pendola's motion to tax costs. As is relevant here, the trial court denied Pendola's motion to tax as it related to: (1) $500 for the motion to allow attorney Kim DeShano to appear pro hac vice[7]; (2) $7,162.25 for travel expenses for various depositions that occurred in Sacramento; and (3) mediator fees of $1,575 and travel expenses for the mediation of $4,090.79. Pendola contends the trial court erred in denying its motion to tax costs with respect to these three items. We disagree.

"Except as otherwise expressly provided by statute, a prevailing party is entitled as a matter of right to recover costs in any action or proceeding." (Code Civ. Proc. § 1032, subd. (b).) "Any award of costs shall be subject to the following: ¶] . . . Allowable costs shall be reasonably necessary to the conduct of the litigation rather than merely

---

[7] "Pro hac vice" means "[f]or this occasion or particular purpose" and typically "refers to a lawyer who has not been admitted to practice in a particular jurisdiction but who is admitted there temporarily for the purpose of conducting a particular case." (Black's Law Dict. (9th ed. 2009) p. 1331, col. 1.)

convenient or beneficial to its preparation." (Code Civ. Proc., § 1033.5 , subd. (c)(2).)
" 'Whether a cost item was reasonably necessary to the litigation presents a question of
fact for the trial court and its decision is reviewed for abuse of discretion.' " (*Acosta v. SI
Corp.* (2005) 129 Cal.App.4th 1370, 1380.)

Pendola contends as to all three, the "costs [we]re not reasonable under the
circumstances" (although Pendola fails to articulate why). There was no abuse of
discretion in the trial court finding otherwise.

As to (1), $500 for the motion to allow attorney DeShano to appear pro hac vice,
attorney DeShano was one of defendants' long-standing attorneys, litigating on their
behalf for 10 years. The only local Sacramento attorney who did a lot of work on the
case was a second-year associate on the case, who needed DeShano's competence to
defend a case that Pendola now valued at over $10 million.

As to (2), $7,162.25 for travel expenses for various depositions that occurred in
Sacramento, the trial court found that "[t]he travel costs for additional out-of-state
attorneys were reasonably necessary to defend this action." As noted, the local attorney
was much less experienced than DeShano. And, the other out-of-state attorney (Rita
Alliss Powers) had represented defendants for over 15 years. Defendants submitted
invoices for the airline fees, which included using the "[b]ase fare" on the airfare, limited
taxicab service, and hotels such as the Embassy Suites. No abuse of discretion appears as
to this item either.

Finally, as to (3), the mediator fees of $1,575 and travel expenses for the
mediation of $4,090.79, there was no abuse of discretion there, as well. As to the
mediator fees and the travel expenses for the mediation, the trial court ruled that "[w]hile
such fees are discretionary under Code of Civil Procedure § 1033.5(c)(4), the court
determines the fees were material to the litigation." Defendants presented evidence that
after they filed their motion for summary judgment on November 1, 2012, the parties
agreed to participate in voluntary mediation. Two weeks before the mediation was when

33

Pendola filed its motion for leave to file a third amended complaint that added seven new defendants and three claims and almost tripled the monetary demand in the complaint to over $10 million. "Based on these new claims, Pendola entered the mediation with a significantly inflated damage calculation and settlement demand." As a result, "[d]efendant's counsel from Chicago came to the mediation along with four corporate representatives, three of whom traveled from the East Coast." Given the manner in which Pendola unexpectedly at the last minute upped the stakes of the litigation, the trial court acted within its discretion in determining that defendants' response in increasing the number of representatives it had at the mediation was reasonably necessary.

## DISPOSITION

The judgment is affirmed. Defendants shall recover their costs on appeal. (Cal. Rules of Court, rule 8.278(a)(1).)


                                                    ROBIE             , Acting P. J.



We concur:



      MAURO          , J.



      HOCH           , J.


34