Filed 6/28/22

CERTIFIED FOR PUBLICATION

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| JJD-HOV ELK GROVE, LLC, | C094190 |
| Plaintiff and Appellant, | (Super. Ct. No. 34-2019-00248163-CU-BC-GDS) |
| v. | |
| JO-ANN STORES, LLC, | |
| Defendant and Respondent. | |

APPEAL from a judgment of the Superior Court of Sacramento County, Shama H. Mesiwala, Judge.  Affirmed.

Whitney, Thompson & Jeffcoach, Marshall C. Whitney and Jacob S. Sarabian for Plaintiff and Appellant.

DLA Piper, Mark E. McKeen and Eva K. Schueller for Defendant and Respondent.

1

The issue in this case is whether a co-tenancy provision in a retail lease for space in a shopping center is enforceable.[1]  The landlord is appellant JJD-HOV Elk Grove, LLC (JJD) and the tenant is respondent Jo-Ann Stores, LLC (Jo-Ann).  The co-tenancy provision in the parties' lease requires the shopping center to have either (1) three anchor tenants or (2) 60 percent of the space leased, and, if it does not, JoAnn is permitted to pay "Substitute Rent."

In 2018, Jo-Ann informed JJD it intended to start paying Substitute Rent effective July 1, 2018, because the co-tenancy provision was not met after two anchor tenants closed.  JJD responded that the co-tenancy provision was an unenforceable penalty under the holding in *Grand Prospect Partners, L.P. v. Ross Dress for Less, Inc.* (2015) 232 Cal.App.4th 1332 (*Grand Prospect*).  Jo-Ann contended *Grand Prospect* was distinguishable and the co-tenancy provision was enforceable.  JJD and Jo-Ann filed competing complaints for declaratory relief and cross-motions for summary judgment.  The trial court found the co-tenancy provision was enforceable, and thus granted Jo-Ann's motion, denied JJD's, and entered judgment accordingly.  JJD now appeals.

As we will explain in more detail below, we decline to follow the rule announced in *Grand Prospect* here, and instead hold that this case is governed by the general rule that courts enforce contracts as written.  We therefore agree with the trial court's conclusion that the co-tenancy provision at issue in this case is enforceable, and will affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

As found by the trial court, the facts are largely undisputed.  Indeed, the separate statements filed by the parties in support of their respective motions contain very similar facts.

---

[1] The term is frequently spelled "cotenancy."  We spell it co-tenancy because that is how the parties spell it.

JJD owns a shopping center in Elk Grove.  In June 2003, JJD and Jo-Ann entered into a lease agreement pursuant to which Jo-Ann leased approximately 35,000 square feet of space in the shopping center.[2]  The term of the lease was 10 years, commencing in September 2004, with four options to extend the term for five years each.  "Fixed Minimum Rent" was initially $36,458 per month, and it increased every five years.  At the time of the events giving rise to these lawsuits, Fixed Minimum Rent was $42,292 per month.

As relevant here, the lease contains a co-tenancy provision that provides, "To induce Tenant to enter into this Lease . . . Landlord represents that it has entered into or shall enter into binding leases . . . for the use and occupancy of *either*:  (x) [three so-called 'anchor tenants' or comparable substitutes] . . . *or* (y) sixty percent (60%) or more of the gross leasable area of the Shopping Center (excluding the Premises)."  (Italics added.)  The co-tenancy provision must be met by tenants that are open for business.  If the co-tenancy provision is not met, Jo-Ann "shall be obligated to pay only Substitute Rent" until it is met, and if the co-tenancy provision is not met for a period of six months, Jo-Ann has the option either to "continue its tenancy . . . subject to the obligation to pay only Substitute Rent until the satisfaction of the co-tenancy requirement," or to terminate the lease.  Substitute Rent is the greater of 3.5 percent of Jo-Ann's gross sales (except pattern sales), or $12,000 per month, and is "in lieu of the Fixed Minimum Rent . . . required to be paid hereunder."  The lease thus specifies two different rents:  Fixed Minimum Rent and Substitute Rent.  If the co-tenancy provision is met, Jo-Ann owes Fixed Minimum Rent, and if it is not met, Jo-Ann owes Substitute Rent.

---

[2]  The lease was executed by JJD's predecessor in interest (Elk Grove Marketplace, LLC, or EGM) and Jo-Ann's predecessor in interest (FCA of Ohio, Inc.).  JJD became the successor in interest to EGM in 2007, and Jo-Ann became the successor in interest to FCA in 2014.  Because neither party suggests this is relevant, this decision refers to the parties as JJD and Jo-Ann at all times.

The parties have produced very little evidence about the negotiations that led to the lease. What little evidence they have produced, however, demonstrates the co-tenancy provision was negotiated by the parties. The evidence shows that Jo-Ann initially proposed that Substitute Rent would be either 3 percent of sales or $2,000 per month, but that those amounts were ultimately increased to the amounts stated above (i.e., the greater of 3.5 percent of sales or $12,000 per month). The evidence also shows the parties discussed whether the percent alternative should be 60 percent, 70 percent, or 80 percent of gross leasable area, before ultimately agreeing to 60 percent. The parties also agreed to amend the co-tenancy provision. As originally executed, the anchor tenants were unidentified and would collectively occupy at least 72,000 square feet. Shortly after the lease was executed, the parties amended it to identify two of the three anchor tenants (Sports Chalet and Sacramento Food Cooperative) and to decrease the anchor tenants' square footage to 68,000.

Jo-Ann invoked the co-tenancy provision twice prior to the events giving rise to these lawsuits. For several months in late 2004/early 2005, Jo-Ann paid Substitute Rent until all three anchor tenants were open for business. Then, in 2007, a dispute arose over whether Jo-Ann had a right to pay Substitute Rent after Sacramento Food Cooperative was replaced by Grocery Outlet. The dispute centered around whether Grocery Outlet was a comparable substitute tenant, not whether the co-tenancy provision was enforceable. JJD filed a complaint for declaratory relief against Jo-Ann regarding whether the Substitute Rent provision was triggered. The complaint acknowledged that the lease provides Jo-Ann is entitled to pay Substitute Rent if JJD failed to meet its co-tenancy obligations. The parties ultimately settled their dispute by an agreement that stated neither party waived their respective contentions regarding how the co-tenancy provision was defined or satisfied.

The present dispute arose on July 5, 2018, when Jo-Ann informed JJD it intended to start paying Substitute Rent effective July 1, 2018, because the co-tenancy provision

4

was not met after two anchor tenants (Sports Chalet and Toys R Us) closed. Sports Chalet closed in mid-2016, and Toys R Us closed June 30, 2018. It appears it was the closure of Toys R Us that brought the shopping center's occupancy to below 60 percent, which, according to Jo-Ann, triggered its right to pay Substitute Rent. JJD has proffered facts and submitted evidence that shows Jo-Ann paid Substitute Rent for approximately 20 months between June 1, 2018, and May 26, 2020. On May 26, 2020, Scandinavian Designs opened in the former Toys R Us space. Jo-Ann returned to paying Fixed Minimum Rent once Scandinavian Designs opened.

JJD contends the co-tenancy provision in the lease is an unenforceable penalty in light of *Grand Prospect, supra*, 232 Cal.App.4th 1332, and it filed a complaint against Jo-Ann for declaratory relief and breach of contract. It requested a judicial declaration that the co-tenancy provision is an unenforceable penalty and Jo-Ann is thus obligated at all times to pay Fixed Minimum Rent, and money damages for unpaid rent. It states that as of January 5, 2021, Jo-Ann owed it $638,293 in rent (assuming the co-tenancy provision is unenforceable and Jo-Ann at all times owed Fixed Minimum Rent), and Jo-Ann does not dispute the amount (although it does dispute whether it owes the amount). Jo-Ann filed a cross-complaint against JJD seeking a judicial declaration that the co-tenancy provision is valid and enforceable.

The parties filed cross-motions for summary judgment, with JJD arguing the co-tenancy provision is an unenforceable penalty and Jo-Ann arguing the opposite. The trial court ruled in Jo-Ann's favor. It held *Grand Prospect* was distinguishable and JJD's reliance on it was misplaced. It also held the co-tenancy provision did not impose damages for breach of contract but instead simply provided for a different rent structure or alternative rent payments in the event certain contingencies (e.g., reduced occupancy of the shopping center) occurred. The trial court thus held the co-tenancy provision in the parties' lease was enforceable. JJD timely appealed.

5

# DISCUSSION

## I

### *Standard of Review*

A party is entitled to summary judgment "if all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." (Code Civ. Proc., § 437c, subd. (c).) "We review a grant of summary judgment de novo; we must decide independently whether the facts not subject to triable dispute warrant judgment for the moving party as a matter of law." (*Intel Corp. v. Hamidi* (2003) 30 Cal.4th 1342, 1348.) " 'Where a motion for summary judgment has been granted and there is a sufficient ground to support the judgment entered thereon, it will be upheld regardless of the grounds on which the trial court based its decision.' " (*Troche v. Daley* (1990) 217 Cal.App.3d 403, 407; see also *Airlines Reporting Corp. v. Renda* (2009) 177 Cal.App.4th 14, 21 ["we review the judgment, not the rationale, and may affirm if the judgment is correct on any theory"].)

Whether a contractual provision is unenforceable is a question of law that is determined by the trial court. (*Grand Prospect, supra*, 232 Cal.App.4th at p. 1354.) As a question of law, the trial court's determination is subject to de novo review on appeal, "but the factual foundation for appellate review consists of (1) the facts that are not in dispute and (2) the facts that are established by viewing the conflicting evidence in the light most favorable to the trial court's judgment." (*Id*. at p. 1355.) The trial court found the facts in this case are undisputed, and neither party suggests otherwise.

## II

### *Analysis*

#### A. *Overview of Co-tenancy Provisions*

"A cotenancy clause conditions a retail tenant's opening for business, or continuing operation of its business at the designated premises, on the opening for business or continued operation by other tenants in the shopping center." (Retail

Leasing: Drafting and Negotiating the Lease (Cont.Ed.Bar 2021 supp.) Cotenancy Requirements, § 7.1 (Retail Leasing).)  "Cotenancy requirements are generally found only in retail leases."  (*Ibid*.)  "The need for a cotenancy provision in a retail lease arises because of the effect that anchor tenants have on a shopping center.  Anchor tenants attract customers to the shopping center.  The financial viability of a shopping center depends on having desirable anchor tenants.  Nearly all shopping centers have at least one anchor tenant.  Cotenancy provisions may also require a specified level of occupancy by the non-anchor tenants.  No retail tenant wants to be stuck in a shopping center filled with vacant stores.  A cotenancy provision provides the tenant with rent abatement and perhaps a right to terminate the lease when the cotenancy provision is violated." (5 Thompson on Real Property (3rd Thomas Ed. 2022 supp.) § 44.14(b)(1), fns. omitted.)

"A cotenancy provision is typically entered into after lengthy negotiations between the landlord and the tenant.  These are typically sophisticated parties who are well-represented by their attorneys.  The facts and circumstances regarding the desirability of the premises and the bargaining strength of the parties plays a major role in the drafting of the provision."  (5 Thompson on Real Property, *supra*, § 44.14(b)(2).)

"The major points covered by cotenancy provisions are (1) the specific named cotenants and level of occupancy required, (2) any right the landlord has to cure failures to meet a cotenancy requirement, and (3) the tenant's remedies if a cotenancy failure occurs.  (1 Retail Leasing, *supra*, § 7.1, p. 7-2.)  These three major points can be resolved by the landlord and tenant in many different ways.  Consequently, there is no standard form of cotenancy requirements."  (*Grand Prospect, supra*, 232 Cal.App.4th at p. 1343.)

At least prior to *Grand Prospect*, it appears that co-tenancy provisions have generally been assumed by the parties and found by the courts to be valid and enforceable.  (See, e.g., Retail Leasing, *supra*, § 7.23 ["Before *Grand Prospect Partners* . . . , a well-recognized remedy for the failure of a cotenancy requirement was for the tenant to abate or reduce the amount of rent it was required to pay"].)  According to a

7

treatise on real property, "[c]ourts generally appear to enforce cotenancy provisions when called upon to do so. There are relatively few reported court decisions addressing the validity of these provisions. Given the large number of retail leases containing these provisions it appears that these provisions function as the parties intend them to." (5 Thompson on Real Property, *supra*, § 44.14(b)(4), fn. omitted.)[3]

### B. *The Grand Prospect Decision*

JJD relies on a rule announced in *Grand Prospect* in arguing that the co-tenancy provision in the parties' lease is an unenforceable penalty because of the lack of a proportional relationship between the forfeiture compelled and the damages or harm that might actually flow from the failure to perform a covenant or satisfy a condition. *Grand Prospect* involved a co-tenancy provision in a retail lease between the owner of a shopping center (the landlord) and Ross Dress for Less (Ross). The lease was for a 10-year term with four 5-year renewal options (like the lease in this case). Rent was approximately $39,500 per month and would increase every five years. (*Grand Prospect, supra*, 232 Cal.App.4th at pp. 1338-1340.) The co-tenancy provision required Mervyn's to be open for business on the date Ross's lease commenced, and if it was not, Ross was

---

[3] Cases from other states upholding co-tenancy provisions include *Boca Park Marketplace Syndications Grp., LLC v. Ross Dress for Less, Inc.* (D.Nev. June 20, 2019, 2:16-cv-01197-RFB-PAL) 2019 U.S. Dist. Lexis 103985 (enforcing provision allowing tenant to pay "Substitute Rent" of 2 percent of gross sales in lieu of "Minimum Rent" if co-tenancy requirement not met); *Kleban Holding Co., LLC v. Ann Taylor Retail, Inc.* (D.Conn. Nov. 26, 2013, 3:11-CV-01879 (VLB)) 2013 U.S. Dist. Lexis 168231 (enforcing co-tenancy provision allowing tenant to pay reduced rent of 5 percent of gross sales if either Borders or 50 percent of other retail space in mall were not open); *Hickory Grove, LLC v. Rack Room Shoes, Inc.* (E.D.Tenn. May 21, 2012, 1:10-cv-290) 2012 U.S. Dist. Lexis 70353 (enforcing co-tenancy provision allowing tenant to pay reduced rent of 4 percent of gross sales if various co-tenancy requirements failed); and *Old Navy, LLC v. Ctr. Devs. Oreg, LLC* (D.Or. June 13, 2012, 3:11-472-KI) 2012 U.S. Dist. Lexis 82579 (enforcing co-tenancy provision allowing tenant to pay "Alternate Rent Remedy" equal to lesser of 2 percent of gross sales if co-tenancy requirement not met and finding "the Alternate Rent Remedy is not a liquidated damages provision").

not required to open for business and it owed no rent; the court referred to this as the rent abatement provision. (*Id*. at pp. 1340, 1344-1345.) The co-tenancy provision also gave Ross the option to terminate the lease if the Mervyn's space remained vacant for 12 months; the court referred to this as the termination provision. (*Id*. at p. 1345.) Mervyn's never opened, and its space remained vacant for 12 months. (*Id*. at p. 1341.) Ross opted not to open a store or pay any rent, and it terminated the lease at the end of the 12-month period. (*Ibid*.) The landlord filed a complaint seeking a judicial declaration that the co-tenancy provision was unenforceable and damages for unpaid rent, future rent for the full term of the lease, and expenditures on tenant improvements. The case proceeded to a jury trial. The trial court determined the co-tenancy provision was both unconscionable and an unenforceable penalty and struck those provisions from the lease, and the jury thereafter awarded the landlord over $3.7 million in damages. (*Id*. at p. 1342.) Ross appealed, and the appellate court affirmed in part and reversed in part.

On appeal, the appellate court first held the co-tenancy provision could not be invalidated on unconscionability grounds because there was no oppression or inequality in bargaining power.[4] (*Grand Prospect, supra*, 232 Cal.App.4th at pp. 1347-1348, 1352-1354.) It then turned to whether the co-tenancy provision was an unenforceable penalty.

After canvassing California case law on penalties, the *Grand Prospect* court held: "Under California law, the characteristic feature of a penalty is the lack of a proportional relationship between the forfeiture compelled and the damages or harm that might actually flow from the failure to perform a covenant or satisfy a condition. (*Ridgley v. Topa Thrift & Loan Assn.* (1998) 17 Cal.4th 970, 977.) In other words, an unenforceable penalty 'bears no reasonable relationship to the range of actual damages the parties could have anticipated would flow' from a breach of a covenant or a failure of a condition.

---

[4] JJD does not raise an unconscionability argument here.

9

(*Greentree Financial Group, Inc. v. Execute Sports, Inc.* (2008) 163 Cal.App.4th 495, 497.) [¶] Therefore, the general rule for whether a contractual condition is an unenforceable penalty requires the comparison of (1) the value of the money or property forfeited or transferred to the party protected by the condition to (2) the range of harm or damages anticipated to be caused that party by the failure of the condition. If the forfeiture or transfer bears no reasonable relationship to the range of anticipated harm, the condition will be deemed an unenforceable penalty." (*Grand Prospect, supra*, 232 Cal.App.4th at p. 1358.)

After announcing the general rule, the *Grand Prospect* court proceeded to separately analyze the rent abatement provision and the termination provision. It concluded the termination provision was enforceable and Ross could rely on it to terminate the lease 12 months after it commenced. (*Grand Prospect, supra*, 232 Cal.App.4th at p. 1367.) However, it also concluded the rent abatement provision was an unenforceable penalty. (*Id*. at pp. 1361-1365.)

Applying the general rule it announced, the court found that because Ross was not required to pay any rent, the value of the property forfeited by the landlord was the full monthly rent specified in the lease, which amounted to approximately $39,500 per month. (*Grand Prospect, supra*, 232 Cal.App.4th at pp. 1361-1362.) As for the harm anticipated, the court noted the trial court explicitly found " 'Ross did not anticipate any damage, *i.e.*, lost sales or profits, if or because Mervyn's would not be open on the Commencement Date' " of the lease, and Ross did not challenge this finding. (*Id*. at p. 1362; see *id.* at pp. 1362-1363.) The *Grand Prospect* court agreed with the trial court's determination that there was no reasonable relationship between the value of the property forfeited by Grand Prospect ($39,500 per month) and the anticipated harm to Ross ($0 per month). The *Grand Prospect* court also agreed with the trial court's conclusion that the rent abatement provision was an unenforceable penalty. (*Id*. at p. 1365.)

10

*C. Civil Code Section 1671*

When discussing the test for determining whether a co-tenancy provision is an unenforceable penalty, the *Grand Prospect* court cited almost exclusively to cases interpreting Civil Code sections 1670 and 1671,[5] but it did not cite or analyze those statutory sections. (*Grand Prospect, supra*, 232 Cal.App.4th at pp. 1346, 1355-1358.)

Civil Code section 1671 states, "a provision in a contract liquidating the damages for the breach of the contract is valid unless the party seeking to invalidate the provision establishes that the provision was unreasonable under the circumstances existing at the time the contract was made." (Civ. Code, § 1671, subd. (b).) " 'The term "liquidated damages" is used to indicate an amount of compensation to be paid in the event of a breach of contract, the sum of which is fixed and certain by agreement, and which may not ordinarily be modified or altered when damages actually result from nonperformance of the contract.' " (*McGuire, supra*, 220 Cal.App.4th at p. 521.) A liquidated damages provision that is deemed invalid and thus unenforceable pursuant to Civil Code section 1671 is called a "penalty." (*Garrett v. Coast & Southern Fed. Sav. & Loan Assn., supra*, 9 Cal.3d. at p. 736, fn. 4; *Blank v. Borden, supra*, 11 Cal.3d at p. 969, fn. 4.) By its terms, Civil Code section 1671 only applies to "a provision in a contract liquidating the damages for the breach of the contract." (Civ. Code, § 1671, subd. (a).)

There was no suggestion by the *Grand Prospect* court that the failure of Mervyn's to open resulted in a breach of the lease by the landlord. The *Grand Prospect* court found, however, that "a contract provision triggered by one or more *conditions precedent*

---

[5]  Those cases include, in the order in which they are cited, *Beasley v. Wells Fargo Bank* (1991) 235 Cal.App.3d 1383; *Harbor Island Holdings v. Kim* (2003) 107 Cal.App.4th 790; *Garrett v. Coast & Southern Fed. Sav. & Loan Assn.* (1973) 9 Cal.3d 731; *McGuire v. More-Gas Investments, LLC* (2013) 220 Cal.App.4th 512 *(McGuire)*; *Fox Chicago R. Corp. v. Zukor's* (1942) 50 Cal.App.2d 129; *Blank v. Borden* (1974) 11 Cal.3d 963; *Ridgley v. Topa Thrift & Loan Assn., supra*, 17 Cal.4th 970; and *Greentree Financial Group, Inc. v. Execute Sports, Inc., supra*, 163 Cal.App.4th 495.

11

can be deemed a penalty under California law," and that "it is possible for a *condition precedent* to operate as a penalty." (*Grand Prospect, supra*, 232 Cal.App.4th at p. 1355, italics added.) " '[A] condition precedent is either an act of a party that must be performed or an uncertain event that must happen before the contractual right accrues or the contractual duty arises.' [Citations.]" (*JMR Construction Corp. v. Environmental Assessment & Remediation Management, Inc*. (2015) 243 Cal.App.4th 571, 593.) The *Grand Prospect* court thus appears to have concluded the rent abatement portion of the co-tenancy provision was triggered by a condition precedent, or, to borrow the language of the case just quoted, that the shopping center's occupancy by other tenants was an "uncertain event that must happen before the contractual right [to full rent] accrues." (*Ibid*.)

The *Grand Prospect* court also noted "the Legislature has directed California courts to put substance before form. Civil Code section 3528 states: 'The law respects form less than substance.' " (*Grand Prospect, supra*, 232 Cal.App.4th at p. 1356.) The *Grand Prospect* court thus appears to have concluded that the co-tenancy provision in the parties' lease was *substantively equivalent* to a liquidated damages provision, even if it was not formally a liquidated damages provision, and that it was thus appropriate to determine the provision's enforceability using the rules developed in cases interpreting Civil Code section 1671.

We decline to follow the rule announced in *Grand Prospect* that a co-tenancy provision reducing rent if a specified condition occurs (e.g., if an anchor tenant is not open or if occupancy drops below a certain level) is an unenforceable penalty unless the reduction has a reasonable relationship to the harm the parties anticipated would be caused thereby. We do so because the rule is based on Civil Code section 1671, a statute governing the enforceability of contract provisions liquidating damages for breach of contract, and we find that statute to be inapplicable to the facts of this case because there

is no suggestion that reduced occupancy in the shopping center resulted in JJD's breach of the parties' agreement.**6**

*D. Civil Code Section 3275*

JJD argues that the co-tenancy provision should be viewed under the general law regarding forfeiture, and it cites Civil Code Section 3275, stating it supplies "the law" and the "general rule" "governing contractual penalty provisions in California." Other than quoting Civil Code section 3275, both in its brief and at oral argument, JJD never discusses that statute or explains its applicability to this case. Moreover, it was not cited in the trial court by the parties, or in the trial court's decision.

The *Grand Prospect* court briefly discussed Civil Code section 3275, which provides, "Whenever, by the terms of an obligation, a party thereto incurs a forfeiture, or a loss in the nature of a forfeiture, by reason of his failure to comply with its provisions, he may be relieved therefrom, upon making full compensation to the other party, except in case of a grossly negligent, willful, or fraudulent breach of duty." The court in *Grand Prospect* held, "if a conditional provision in a contract constitutes an illegal penalty, then the affected party 'incurs a forfeiture' for purposes of Civil Code section 3275 and 'may be relieved therefrom.' (Civ. Code, § 3275.) [¶] Therefore, the trial court did not err when it applied Civil Code section 3275 to the rent abatement provision in the Lease."

---

**6** We do *not* hold that a co-tenancy provision can never be an unenforceable penalty. If a particular co-tenancy provision is "a provision in a contract liquidating damages for the breach of the contract" within the meaning of Civil Code section 1671, then it may be found to be an unenforceable penalty if "the party seeking to invalidate [it] establishes [it] was unreasonable under the circumstances existing at the time the contract was made." (Civ. Code, § 1671, subd. (b).) Here, we hold only that Civil Code section 1671 does not apply *in this case* because no one suggests this particular co-tenancy provision is a provision liquidating damages for breach of the parties' agreement. Indeed, JJD conceded at oral argument that the failure of the co-tenancy provision was not a breach of the lease and also conceded that Civil Code section 1671 therefore does not apply to the facts of this case.

(*Grand Prospect, supra*, 232 Cal.App.4th at p. 1365.) It thus appears the *Grand Prospect* court equated an unenforceable penalty with a forfeiture within the meaning of Civil Code section 3275. Based on the record before us, we decline to do the same.

### E. *The Co-tenancy Provision is Valid and Enforceable*

Finding the rule announced in *Grand Prospect* to be inapplicable here, we go on to conclude that this case is governed by the rule posited by Jo-Ann: "[T]he parties' contractual intent when reduced to writing should be controlling and enforced, particularly as applied to the commercial leasing market in arms-length negotiations and transactions."[7]

As a general rule, " 'It is not the province of the Court to alter a contract by construction or to make a new contract for the parties; its duty is confined to the interpretation of the one which they have made for themselves, and, in the absence of any ground for denying enforcement, to enforcing or giving effect to the contract as made, that is, to enforce or give effect to the contract as made without regard to its wisdom or folly, to the apparent unreasonableness of its terms, or to the fact that the rights of the parties are not carefully guarded as the court cannot supply material stipulations or read into the contract words which it does not contain so as to change the meaning of the words contained in the contract.' " (*Estate of Bodger* (1955) 130 Cal.App.2d 416, 425.) The general rule applies even if a contract gives one party what might appear to be an unfair windfall: "We shall assume for argument's sake that [one party to a contract] has enjoyed great good luck over against the [other party]. But the pertinent [contracts] provide what they provide. [The parties] were generally free to contract as they pleased.

---

[7] JJD acknowledges this is an accurate statement of the law, but it notes the rule that contracts are enforceable as written is subject to exceptions and limitations. Although this is true, the exception that it posits—i.e., the rule in *Grand Prospect*—is one we find inapplicable for the reasons just stated, which means we return to the general rule.

14

[Citation.] They evidently did so. They thereby established what was 'fair' and 'just' inter se. We may not rewrite what they themselves wrote. [Citation.] We must certainly resist the temptation to do so here simply in order to adjust for chance—for the benefits it has bestowed on one party without merit and for the burdens it has laid on others without desert." (*Aerojet-General Corp. v. Transport Indemnity Co.* (1997) 17 Cal.4th 38, 75; see also *Third Story Music, Inc. v. Waits* (1995) 41 Cal.App.4th 798, 809 [" 'The courts cannot make better agreements for parties than they themselves have been satisfied to enter into or rewrite contracts because they operate harshly or inequitably' "].)

JJD argues this is one of those cases that is not governed by the general rule, and that this court should deny enforcement of the co-tenancy provision in the parties' contract. We disagree.

In this regard, and like the trial court, we find *Constellation-F, LLC v. World Trading 23, Inc.* (2020) 45 Cal.App.5th 22 (*Constellation-F*) is instructive. JJD argues *Constellation-F* is inapplicable because it involved a holdover rent provision rather than a co-tenancy provision. This is true but not dispositive. The challenged provision in *Constellation-F* was in a commercial lease for warehouse space. The lease provided base rent would increase by 150 percent if the tenant remained after the lease expired. Such a provision is known as a holdover rent provision. The tenant did not move out after the lease expired, and the landlord filed a lawsuit seeking damages for past due rent at the holdover rate. (*Id.* at p. 25.) The trial court ruled the holdover rent provision was an unenforceable penalty. The landlord appealed, and the appellate court reversed. (*Id.* at p. 26.) Among other things, the appellate court held that Civil Code section 1671 was inapplicable because it only applied to contractual provisions that attempted to set damages for breach of contract. The holdover rent provision, in contrast, did not set damages for breach of contract. Instead, it provided two different rental rates, or what the court referred to as a " 'graduated rental.' " (*Constellation-F, supra*, 45 Cal.App.5th at p. 26.) One rate applied during the term of the lease (base rent) and the other applied

15

after the lease expired (base rent increased by 150 percent). According to the court, "Graduated rentals are not damages. A graduated rental is the rate for leasing the property. By its terms, then, Civil Code section 1671 did not apply to the holdover rent provision." (*Constellation-F*, at p. 27.)

The trial court appears to have viewed the co-tenancy provision in this case similarly when it stated, "the Lease's co-tenancy provisions . . . do not reflect 'damages' but instead reflect terms for a different rent structure in the event certain contingencies occur." We agree. Like the lease in *Constellation-F*, the lease in this case establishes two different rents: Fixed Minimum Rent and Substitute Rent. Fixed Minimum Rent is the rate if the co-tenancy provision is satisfied, and Substitute Rent is the rate if it is not. And like the holdover rent provision in *Constellation-F*, the co-tenancy provision in this case does not fix damages for breach of the lease or the failure of a condition, and its enforceability is thus not governed by Civil Code section 1671.

The trial court also cited *McGuire, supra*, 220 Cal.App.4th 512 for a similar proposition. Although it also did not involve a co-tenancy provision, *McGuire* is also instructive. In that case, the plaintiffs contracted to purchase two lots from the defendant for $1.05 million. The purchase agreement provided that three neighboring lots would not be permitted to build any structure within 900 feet of an access road, and that the defendant would take any steps necessary to amend the covenants, conditions, and restrictions (CC&Rs) to ensure the neighboring lots would not be permitted to build such structures. The purchase agreement also provided the defendant would refund the plaintiffs $80,000 from the purchase price if it was unable to amend the CC&Rs within two months of the close of escrow. Escrow closed, and the defendant failed to amend the CC&Rs within two months. The plaintiffs demanded a $80,000 refund, the defendant refused, and the plaintiffs sued to recover that amount. (*Id.* at pp. 514-515, 519.) The defendant moved for summary judgment on the ground that the $80,000 refund provision was an unenforceable penalty rather than a valid liquidated damages provision. The trial

16

court agreed and granted the motion, the plaintiffs appealed, and the appellate court reversed. After surveying the law of liquidated damages and Civil Code section 1671, the court stated, "It is important to recognize . . . that a provision in a contract that appears at first glance to be either a liquidated damages clause or an unenforceable penalty provision may instead merely be a provision that permissibly calls for alternative performance by the obligor. 'A contractual provision that merely provides an option of alternative performance of an obligation does not impose damages and is not subject to section 1671 limitations.' [Citation.] Thus, notwithstanding the limitations on liquidated damages clauses provided in Civil Code section 1671, the courts 'recognize . . . the validity of provisions varying the acceptable performance under a contract upon the happening of a contingency.' " (*McGuire, supra*, 220 Cal.App.4th at pp. 522-523.) In other words, like *Constellation-F*, *McGuire* supports the conclusion that the co-tenancy provision in this case does not liquidate damages or impose a penalty for breach of contract or the failure of a condition, and that Civil Code section 1671 and the line of cases interpreting it do not apply. Instead, the co-tenancy provision simply varies the rent owed by Jo-Ann based on the shopping center's occupancy. If three anchor tenants are open for business or if 60 percent of the space is occupied, then Fixed Minimum Rent is owed; if not, then Substitute Rent is owed. And according to *McGuire* and *Constellation-F*, a contractual provision that provides for alternative performance or different rents is valid.

Although it is not binding on us, at least one other case has interpreted a co-tenancy provision as a valid and enforceable "dual" or "alternative" rent provision rather than an unenforceable penalty, and we find this analysis persuasive. In *Boca Park Marketplace Syndications Grp., LLC v. Ross Dress for Less, Inc., supra*, 2019 U.S. Dist. Lexis 103985, the co-tenancy clause required that 60 percent of the space in the shopping center would be occupied, and if it was not, the tenant's "base rent" obligation would be replaced by "substitute rent" equal to 2 percent of its gross sales. (*Id.* at p. *8.) As in this

17

case, the co-tenancy clause was triggered by another tenant's bankruptcy, and the tenant began paying substitute rent. (*Id*. at p. *9.) We are told that substitute rent "is approximately $12,000 per month, though it varies month to month. The payment of 2% monthly gross sales results in a significantly reduced rent payment from what [the tenant] would otherwise pay for rent." (*Id.* at p. *10.) As in this case, the landlord argued the co-tenancy provision imposed liquidated damages and constituted an unenforceable penalty. The court disagreed, for three related reasons. First, the lease did not require other tenants to be open and operating, and the closure of a tenant thus did not constitute a breach of contract. Instead, the lease established "two alternate rent schemes." (*Id.* at pp. *11-12.) Second, "the parties knowingly adopted a substitute rent amount understanding that it would be lower than the rent amount that [the tenant] would pay if the clause was not triggered. The parties reached such an agreement because it was mutually believed and understood that the value of the lease space to [the tenant] would be less if the other specified tenants were not co-tenants . . . in the shopping center." (*Id.* at p. *12.) And third, "the parties negotiated and agreed to a dual rent provision and not a liquidated damages provision." (*Ibid*.) The *Boca Park* court concluded as follows: "The parties negotiated and agreed to the relative value of the property to [the tenant] dependent on various states of tenancy and occupancy in the Shopping Center. Both parties are sophisticated corporations and both parties were represented by counsel in the negotiation and execution of the lease. They understood that they were negotiating and agreed to a contract with different benefits and risks for each party." (*Id.* at p. *13.)

So, too, in this case. The parties negotiated the lease with the help of counsel. They agreed to two different rental rates based on different types and levels of occupancy in the shopping center. They agreed the co-tenancy provision could be satisfied by either three anchor tenants or 60 percent of the shopping center's space leased. They agreed if the co-tenancy provision was not satisfied, Jo-Ann could pay Substitute Rent. They agreed that Substitute Rent would be the greater of $12,000 or 3.5 percent of sales. All of

18

these terms were actively negotiated and there is no suggestion that either party was unaware of or did not understand any portion of the co-tenancy provision. The parties thus considered the risk of reduced occupancy in the shopping center, and agreed Jo-Ann would pay Substitute Rent if that risk occurred.

"Contracts are, by their very nature, allocations of risk and responsibility as between the parties." (*Southern California School of Theology v. Claremont Graduate University* (2021) 60 Cal.App.5th 1, 10.) In this case, we find that the parties considered and agreed to allocate the risk of reduced occupancy to JJD, and agreed JJD would receive substantially reduced rent if that risk occurred. JJD has received precisely the Substitute Rent it agreed to receive, and we find no basis for relieving JJD from the burden of its agreement.

## DISPOSITION

The judgment is affirmed and Jo-Ann shall recover its costs on appeal. (Cal. Rules of Court, rule 8.278(a)(1), (2).)


      /s/
     EARL, J.


We concur:


   /s/
HOCH, Acting P. J.


   /s/
KRAUSE, J.

19